DELAVAN et al. v. NEW YORK, N. H. & H. R. CO. et al.

(Supreme Court, Special Term, New York County.   July, 1912.)

1. MONOPOLIES (§ 24*)—PARALLEL AND COMPETING LINES.
   In an action to enjoin one railroad company from purchasing control of another, evidence *held* to show that the two lines are parallel and competing, notwithstanding a difference in the grade on parts of the two lines.

   [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

2. MONOPOLIES (§ 24*)—RAILROADS—RIGHTS AS STOCKHOLDERS.
   Stockholders of one railroad company can sue in equity in a state court to enjoin a parallel and competing railroad company from acquiring a controlling interest in the former road, in violation of the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), but have no standing to complain of any acts other than the transfer of the control of the road.

   [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

3. EVIDENCE (§ 20*)—JUDICIAL NOTICE—RAILROAD CONSTRUCTION.
   A court may take judicial notice that the grade of a railroad may be changed.

   [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 24; Dec. Dig. § 20.*]

Action by Tompkins C. Delavan and others against the New York, New Haven & Hartford Railroad Company and others.   On motion for a temporary injunction.   Motion granted.

Guggenheimer, Untermyer & Marshall (Samuel Untermyer, of counsel), for plaintiffs.

Charles M. Sheafe, Jr., for defendant New York, N. H. & H. R. Co.

Alexander S. Lyman, for defendant New York Cent. & H. R. R. Co.

Edwin W. Lawrence, for defendant Rutland R. Co.

GERARD, J. [1, 2]  The plaintiffs move for a temporary injunction to restrain the New Haven Railroad Company from purchasing the control, through ownership of a majority of the stock, of the Rutland Railroad Company, the claim being that the Rutland is potentially, as well as actually, a competitor of the New York, New Haven & Hartford, and that therefore, under the federal anti-trust laws (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), the New Haven cannot purchase control of the Rutland; and they further contend that, independently of the federal statute, the acquisition of the control by one railroad of a competing line is a fraud in law upon the minority stockholders of the controlled road, because of the inconsistent position which the controlling road is compelled to take, and which must naturally result in injury to the minority stockholders of the controlled road.

The Rutland Company is a corporation existing under the laws of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Vermont. Its main line extends from Noyan Junction, on the Canadian line north of Lake Champlain, southerly through the state of Vermont. At Rutland, in the state of Vermont, there are two forks of the Rutland road; one going in a southeasterly direction, to Bellows Falls, Vt., and the other in a southwesterly direction, to Chatham, N. Y. Another branch of the Rutland road extends west through the northern part of the state of New York to Ogdensburg, on the St. Lawrence river, from whence there are boat connections to the Great Lakes. At Chatham the southwesterly fork of the Rutland joins the lines of the New York Central, and at Bellows Falls the southeasterly fork joins the lines of the Boston & Maine. The Boston & Maine road is controlled by the New York, New Haven & Hartford, and for all practical purposes the two roads are the same. The Rutland road owns a line of steamers, through ownership of stock called "Rutland Transic Company," which ply between Ogdensburg and Chicago and Western points on the Great Lakes. The New York Central & Hudson River Railroad Company is a corporation organized under the laws of New York, and has a line extending from New York City to Albany and Buffalo, and by stock ownership or by lease it controls a number of other lines extending to Chicago and other Western points. The system also comprises the Harlem road, extending from New York to Chatham, the West Shore road and other lines in Northern New York, and the New York Central also controls the Boston & Albany Railroad which extends from Albany, through Troy, to Boston. The New York, New Haven & Hartford Railroad Company is a consolidated corporation organized under the laws of Connecticut, Rhode Island, and Massachusetts, and it also, as recited, controls the Boston & Maine Railroad, having lines in Massachusetts, Maine, New Hampshire, and Vermont, and also the Fitchburg road, which extends from Boston to Troy, which road is parallel with the Boston & Albany, controlled by the New York Central. The New York, Ontario & Western Railroad Company has permanent trackage rights over the West Shore Railroad from Weehawken, opposite New York City, to Kingston, on the Hudson river, and extends from Kingston westerly to Oswego, on Lake Ontario, with a southerly branch to Scranton, in the state of Pennsylvania.

In or about the year 1905 the New York Central acquired a majority of the stock of the Rutland Company, and has held it from that time until the carrying out of the agreement with the New Haven road hereinafter referred to. The New Haven road, through ownership of a majority of the stock, controlled the Ontario & Western. The Rutland road, by using its trackage rights in Canada and connecting with the Canadian Pacific, forms a route from New York, via the Harlem road, to the city of Montreal, and it also forms a route from Montreal to Boston by making use of the Boston & Maine, which is part of the New Haven system from Bellows Falls to Boston. It must be remembered that by the present provisions of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) a road like the Rutland road, having its terminus, for instance, at Bellows Falls, has a right to use the New

Haven road from that point to Boston practically as if it were part of its own line, and similarly has a right to use the Harlem road from Chatham to New York under the same conditions; that is to say, that the Rutland road has practically, by the use, under the provisions of the Interstate Commerce Law, of the tracks of the lines which join or connect with it, a through line from Boston to Montreal and a through line from New York to Montreal.. In a similar manner the Boston & Maine may be said to have a through line from Boston to Montreal, using a greater portion of its own tracks than is used by the Rutland route from Boston to Montreal in connection with the Vermont Central, a line controlled by the Grand Trunk Railroad of Canada, and another route using a still greater portion of its own track from Boston to Montreal, first by way of Boston, Concord, Wells River, St. Johnsbury, and Noyan Junction, with an alternative route from St. Johnsbury to Montreal by way of Newport and the Canadian Pacific. It is to be noted, also, that the New Haven had an outlet to the west by means of the New York, Ontario & Western, controlled by it, and that its Fitchburg line ran parallel to the Boston & Albany, controlled by the New York Central, between Boston and Albany.

In February, 1911, the New Haven Company and the New York Central Company entered into an arrangement by the terms of which the Ontario & Western was agreed to be turned over to the New York Central by the New Haven, and the Rutland Company was to be turned over by the New York Central to the New Haven road, and the New Haven, Company and the New York Central were to become partners, as it were, in respect to the Boston & Albany, previously controlled by the New York Central, and the New York Central transferred one-half of the stock of the Rutland, owned by it, to the New Haven, and an agreement with reference to the working of the Boston & Albany was entered into between the New Haven and the New York Central. When the New York Central Company transferred one-half of its holdings of the Rutland to the New Haven no application whatever was made to the Public Service Commission of the State of New York. In November, 1911, the New Haven and the New York Central made an application to the Public Service Commission for the transfer of the control of the Ontario & Western to the New York Central, and, a protest having been made by Rutland stockholders, the New Haven Company then made an application to the Public Service Commission for leave to acquire a majority of the stock of the Rutland Company from the New York Central. Public hearings upon these applications were had before the Public Service Commission for the Second District at Albany, and on April 2, 1912, the Commission denied the application of the New York Central to buy control of the Ontario & Western from the New Haven, and held that no transfer should be made without providing for the protection of the minority stockholders from oppression by the majority. The Commission, however, authorized the transfer of the control of the Rutland Company by the Central to the New Haven, but made, in that

case, no provision for the protection of the minority stockholders of the Rutland.

The defendants claim that the plaintiffs have no standing to bring this action, and allege that an individual stockholder has no right to bring an action in a state court to prevent a violation of the Sherman Act and that the remedies provided by the act are exclusive. It must be noted that acts forbidden by the Sherman Act are declared by the act to be illegal. Defendants rely on Minnesota v. Northern Securities Co., 194 U. S. 48, 24 Sup. Ct. 598, 48 L. Ed. 870. There an action was brought by the state of Minnesota to enjoin a threatened violation of the Sherman Act. Sections 4 and 7 of the act are as follows:

"Sec. 4. The several Circuit Courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violations shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed as soon as may be to the hearing and determination of the case; and, pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises."

"Sec. 7. Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act may sue therefor in any Circuit Court of the United States, in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

Mr. Justice Harlan, writing the opinion, said:

"Further, under that view, every individual owner of property in a state may, upon like general grounds, by an original suit, irrespective of any direct or special injury to him, invoke the original jurisdiction of a Circuit Court of the United States to restrain and prevent violations of the Anti-Trust Act of Congress. We do not think that Congress contemplated any such methods for the enforcement of the Anti-Trust Act. We cannot suppose it was intended that the enforcement of the act should depend in any degree upon original suits in equity instituted by the states or by individuals to prevent violations of its provisions. On the contrary, taking all the sections of that act together, we think that its intention was to limit direct proceedings in equity to prevent and restrain such violations of the Anti-Trust Act as cause injury to the general public, or to all alike, merely from the suppression of competition in trade and commerce among the several states and with foreign nations, to those instituted in the name of the United States under the fourth section of the act by district attorneys of the United States, acting under the direction of the Attorney General, thus securing the enforcement of the act, so far as direct proceedings in equity are concerned, according to some uniform plan operative throughout the entire country. Possibly the thought of Congress was that by such a limitation upon suits in equity of a general nature to restrain violations of the act, irrespective of any direct injury sustained by particular persons or corporations, interstate and international trade and commerce and those carrying on such trade and commerce, as well as the general business of the country, would not be needlessly disturbed by suits brought on all sides and in every direction to accomplish improper or speculative purposes. At any rate, the interpretation we have given of the act is a more reasonable one. It is a safe and conservative interpretation, in view as well of the broad and exclusive power

of Congress over interstate and international commerce as of the fact that so far as such commerce is concerned Congress has prescribed a specific mode for preventing restraints upon it, namely, suits in equity under the direction of the Attorney General. Of the present suit the Attorney General has no control, and is without any responsibility for the manner in which it is conducted, although in its essential features it is just such a suit as would be brought by his direction when proceeding under the fourth section of the Anti-Trust Act."

But I do not read this to mean that a person directly injured cannot maintain a suit to restrain a violation which may directly injure him in respect to the very matters involved in the illegal transaction. It was held in Continental Wall Paper Co. v. Voight & Sons Co., 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486, that where the vendor who sold merchandise was in a combination illegal by the Sherman Act, and where the vendee had purchased goods in pursuance of an illegal agreement under that act, the vendee could set up by way of defense that the contract was therefore illegal under which the merchandise was sold. Mr. Justice Brewer in his dissenting opinion expressly raised the point that the remedies given by the Sherman Act were exclusive. In Shawnee Compress Co. v. Anderson, 209 U. S. 423, 28 Sup. Ct. 572, 52 L. Ed. 865, it was held that a stockholder could bring an action to cancel a lease made by their company to another company, where that lease was in pursuance of a scheme by which the leasing company (engaged in the same business as the lessor) entered into the lease for the purpose of stifling competition and monopolizing the business of compressing cotton, in which business both corporations were engaged. Mr. Justice McKenna said that the case presented acts in aid of a scheme of monopoly, and I think that this case distinctly recognizes the rights of minority stockholders to restrain the carrying out of a scheme by which their company engaged with another company in acts which amounted to violations of the Sherman Law. See, also, Bigelow v. Calumet & Hecla Mining Co. (C. C.) 155 Fed. 869, a direct decision on the point involved. And these cases are distinguishable from other cases in the United States courts, which hold that no person can bring a suit to restrain a violation of the Sherman Act who has been in no other position with regard to the matter in controversy than any other member of the general public. And to the same effect as the cases above cited are Steele v. United Fruit Co. (C. C.) 190 Fed. 631, Mannington v. Hocking Valley R. R. (C. C.) 183 Fed. 133, and Harding v. Am. Glucose Co., 182 Ill. 551, 55 N. E. 577, 64 L. R. A. 738, 74 Am. St. Rep. 189. This last case, however, arose under the laws of Illinois.

Nor can it be argued that the state court has no jurisdiction as was said in the Second Employers' Liabilities Cases, 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327.

"The suggestion that the act of Congress is not in harmony with the policy of the state, and therefore that the courts of the state are free to decline jurisdiction, is quite inadmissible because it presupposes what in legal contemplation does not exist. When Congress in the exercise of the power confided to it by the Constitution adopted that act, it spoke for all the people of all the states, and thereby established a policy for all."

And the court quoted Claflin v. Houseman, 93 U. S. 130, 23 L. Ed. 833, where the court said:

"If an act of Congress gives a penalty to a party aggrieved, without specifying a remedy for its enforcement, there is no reason why it should not be enforced, if not provided otherwise by some act of Congress, by a proper action in a state court; but there is no reason why state courts should not be open for the prosecution of rights growing out of the laws of the United States to which their jurisdiction is competent and not denied."

The plaintiff alleges a conspiracy or scheme whereby the control of the Ontario & Western, which rivaled the Western lines of the Central, was given to the Central, and the rivalry between the Central and New Haven ended by means of the agreement as to the Boston & Albany and the Rutland, an alleged competing line of the New Haven, transferred by the Central to that company. But in my opinion, these plaintiffs have no standing under the Minnesota Case and others to complain of any acts other than the transfer of the control of the Rutland to the New Haven, and then only if the Rutland and the New Haven are competing lines.

A reading of the affidavits submitted shows that the Rutland and the New Haven (through its ownership of the Boston & Maine) are competing lines. The only answer made by defendant to the geographical facts of the location of the lines is that the grades of the lines owned by the New Haven, which lie almost geometrically parallel to the Rutland, are such that competition is not practically possible; but I suppose that no two competing roads in the world have exactly the same grades, nor can any court take such a question into consideration, for at just what difference of per cent. in grade should the courts allow one competing line to purchase control of another?

[3] And a court may take judicial notice that these grades may be changed. In numbers of cases roads in the same situation as the Rutland to the New Haven-Boston & Maine roads have been held to be competing lines. For instance, the Louisville & Nashville, extending from Memphis, through Paducah, to Louisville, was held parallel and competing to the Chesapeake, Ohio & Southwestern, extending from Memphis to Louisville, by way of Bowling Green, Ky., and Clarksville, Tenn. Louisville & Nashville R. R. v. Commonwealth, 97 Ky. 675, 31 S. W. 476. As was said in that case, the word "parallel" was not used in the law "according to its strict meaning of two roads constructed equidistant throughout." See, also, East Line & Red River Co. v. State, 75 Tex. 434, 12 S. W. 690, Southern Penn. R. R. Case (Pa.) 7 Atl. 368, the Northern Securities Case, and the Kanawha & Michigan Case, 12 Ohio Cir. Ct. R. (N. S.) 49.

It is true that some of the above cases arose under state laws, but I cite them to show that roads in a similar position to the roads here have been held to be competing lines. The damage to the plaintiffs is, in addition to the fines and forfeiture which the road might incur, the mere fact of the control by the competing line—the threatened violation of the Sherman law. They are not bound to wait until their property is destroyed by the acts of the majority, who may use their power to destroy the value of the minority stock, as in Farmers' Loan

& Trust Co. v. N. Y. & C. R. R., 150 N. Y. 410–424, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689. The illegal act should be prevented now. And this illegal act is the threatened impairment of an instrumentality of interstate commerce, in which plaintiffs are owners, by the violation of the Sherman Law. Mr. Mellen, of the New Haven, has admitted that the stock of the Rutland, intrinsically and as mere stock, is worth only about $40 per share, but that to the New Haven the stock control is worth over $100 per share. The New Haven may quite possibly greatly increase the traffic sent over the Rutland; but it has it in its power, however, if it controls it, to decrease that traffic until it may have acquired the minority stock at low figures, or even permitted the road to default on its bonds and be sold at auction.

Whatever the rule may be as to other corporations, it was conceded in the argument by defendants' counsel that control of one railroad by another competing one has a natural tendency to impair the service given by both roads. Of course, the Rutland road threatens to do no ultra vires act, nor does the Central, nor the New Haven; but the line of reasoning laid down in Davis v. Congregation, 40 App. Div. 424, 57 N. Y. Supp. 1015, applies. There it was held that, when a corporation threatens to do an ultra vires act, at the suit of any stockholder that act should be restrained, although the act may be of benefit to the corporation. This is not a derivative action, in which plaintiffs seek to represent or stand in the shoes of the corporation. They seek relief against their co-stockholders, the Central, which road has agreed to do with the New Haven an illegal act, and against the New Haven, engaged in the same act—one in which the plaintiffs have a direct interest.

With regard to the sale of the control by the Central to the New Haven, neither any state nor plaintiffs, if citizens only, would have the right to maintain the action; but I think these plaintiffs, minority stockholders, cannot but be affected by the transfer of the control of ownership to a competing line, and I think, therefore, that they are "directly injured," within the meaning of the exception made by Mr. Justice Harlan in the Minnesota Case. Minnesota v. Northern Securities Co., supra. The threatened transfer is illegal; it affects them directly, and there lies their threatened damage; and just as in the case of an action to restrain the ultra vires act of a corporation by one of its stockholders the action will lie, although the act may possibly result in pecuniary benefit to the corporation.

The injunction will be continued, on plaintiffs giving a bond in $5,000.