UNITED STATES v. LAKE SHORE & M. S. RY. CO. et al.

(District Court, S. D. Ohio, E. D. December 28, 1912.)

No. 1,584.

1. MONOPOLIES (§ 16*)—ANTI-TRUST ACT—COMBINATION BETWEEN COAL CARRYING RAILROADS.

Coal carrying railroads extending into the same coal fields, although reaching different mines, or extending into different fields where competing coal is produced, which traverse generally parallel lines and reach either directly or through their connections the same markets in other states, must be regarded as natural competitors in interstate commerce, and any arbitrary methods between them or between them and the coal companies, by which such natural competition is eliminated, is in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig § 16.*]

2. MONOPOLIES (§ 16*)—ANTI-TRUST ACT—COMBINATION BETWEEN COAL CARRYING RAILROADS.

The combination of a number of coal carrying railroads, which were natural competitors, and the acquiring by them of large coal mining interests tributary to their several lines, so that both railroad and mining interests were under a single controlling power, the result being a division of the traffic and the elimination of competition as to interstate as well as domestic shipments, and a discrimination against all new and independent mines, was one in restraint of interstate commerce, and created a monopoly of a part of such commerce in violation of Sherman Anti-Trust Act of July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*

For other definitions, see Words and Phrases, vol. 5, pp. 4570-4574.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3.** MONOPOLIES (§ 21*) — PERSONS LIABLE — JOINDER AFTER CONSPIRACY IS FORMED.

One who learns of a conspiracy or unlawful combination after it is formed, and then joins it or knowingly aids in the execution of the scheme and shares in its profits, becomes from that time as much a co-conspirator as if he were one of those who originally designed it.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 15; Dec. Dig. § 21.*]

**4.** MONOPOLIES (§ 24*)—ANTI-TRUST ACT—SUIT TO RESTRAIN VIOLATION—EVIDENCE.

In considering the legality of a contract between railroad companies claimed to be in restraint of interstate commerce, and in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), evidence to show the relations between the parties and the previous conduct of the business affected is competent.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

**5.** MONOPOLIES (§ 16*)—ANTI-TRUST ACT—COMBINATIONS IN RESTRAINT OF AND TO MONOPOLIZE INTERSTATE COMMERCE.

The Hocking Valley Railway Company and the Toledo & Ohio Central Railway Company each owns and operates a line of road in Ohio from Toledo into the Hocking coal fields in the southeastern part of the state, and from a connection with such lines the Kanawha & Michigan Railway Company owns and operates a line across the river into the Kanawha coal fields in West Virginia. The principal freight business of all the roads is the carriage of coal mined in such fields and destined for lake ports or points further to the north and west. About 1899 the Hocking Valley Company, through stock purchases and otherwise, acquired control of both the other roads, and also of a large number of coal companies owning land and mines tributary thereto. Five trunk lines, again, together purchased a controlling stock interest in the Hocking Valley Company, and the entire combination was practically managed and controlled by a committee appointed by them. In an action by the state against the Hocking Valley Company, which is an Ohio corporation, such combination was adjudged illegal, and the defendant was required to dispose of its controlling interest in the other roads and also in the mines. To meet this situation, a contract was entered into between two of the trunk line stockholders, viz., the Chesapeake & Ohio Railway Company, operating a line from the coast on the south side of the Ohio river to Cincinnati and a subsidiary line from there to Chicago, its main line touching that of the Kanawha & Michigan Company, and the Lake Shore & Michigan Southern Railway Company, operating a line from Buffalo, through Toledo, to Chicago, pursuant to which the Chesapeake & Ohio Company acquired the controlling interest in the Hocking Valley Company and the Lake Shore Company in the Toledo & Ohio Central Company, while the controlling interest in the Kanawha & Michigan Company and the coal companies was divided between them, the contract providing that each should have the right to use the road, and that its north-bound coal traffic should be fairly divided between the Hocking Valley Company and the Toledo & Ohio Central Company. *Held*, that such contract did not change the essential character of the previous arrangement, but was inconsistent with the established rule requiring freedom of competition in interstate commerce, and in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6.** MONOPOLIES (§ 24*)—ANTI-TRUST ACT—SUIT TO ENJOIN VIOLATION.

There is a clear distinction between the power to grant relief respecting the past failure to construct one of two projected parallel lines of railroad and the power to prevent the elimination of one of two parallel roads in actual existence and operation.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

Denison, Circuit Judge, dissenting in part.

In Equity.    Suit by the United States against the Lake Shore & Michigan Southern Railway Company, the Chesapeake & Ohio Railway Company, the Hocking Valley Railway Company, the Toledo & Ohio Central Railway Company, the Kanawha & Michigan Railway Company, the Zanesville & Western Railway Company, the Sunday Creek Company, the Continental Coal Company, and the Kanawha & Hocking Coal & Coke Company.    Decree for complainant.

Sherman T. McPherson, U. S. Atty., of Cincinnati, Ohio, and O. E. Harrison, of Columbus, Ohio, and John L. Lott, of Tiffin, Ohio, Special Assts. to the Atty. Gen., for the United States.

Clyde Brown, Chas. T. Lewis, John H. Doyle, and Frank S. Lewis, all of Toledo, Ohio, for defendants Lake Shore & M. S. Ry. Co., Toledo & O. Cent. Ry. Co., and Zanesville & W. Ry. Co.

Lawrence Maxwell, of Cincinnati, Ohio, H. T. Wickham, of Richmond, Va., and A. C. Rearick, of New York City, for defendant Chesapeake & O. Ry. Co.

Talfourd P. Linn, of Columbus, Ohio, for defendant Kanawha & M. Ry. Co.

Lawrence Maxwell, of Cincinnati, Ohio, James H. Hoyt, of Cleveland, Ohio, and John F. Wilson, of Columbus, Ohio, for defendant Hocking Valley Ry. Co.

William O. Henderson, of Columbus, Ohio, for defendant Sunday Creek Co.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge.    This suit was brought to enjoin further performance of certain agreements alleged to have been made in pursuance of combinations and conspiracies formed and carried out in restraint of trade among the several states, particularly trade in bituminous coal, in violation of Act Cong. July 2, 1890, commonly known as the Sherman Anti-Trust Act (July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]); many of the acts alleged having been committed in whole and others in part within the Eastern Division of the Southern Judicial District of Ohio.

The defendants consist of six railroad companies and three coal companies, named in the margin.[1]    The railroad companies are all

---

[1] The Lake Shore & Michigan Southern Railway Company, the Chesapeake & Ohio Railway Company, the Hocking Valley Railway Company, the Toledo & Ohio Central Railway Company, the Kanawha & Michigan Railway Company, the Zanesville & Western Railway Company, the Sunday Creek Company, the Continental Coal Company, the Kanawha & Hocking Coal & Coke Company.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Ohio corporations, except the Chesapeake & Ohio, which was organized in Virginia and all are engaged in transporting interstate commerce. The coal companies named were created as follows: The Sunday Creek under the laws of New Jersey, and the other two under the laws of West Virginia.

*The Railroads.* It is important to understand the geographical relations of the railroads, and similarly their relations to the coal fields involved. The Lake Shore extends from Buffalo to Chicago, passing through Ohio near the southerly shore of Lake Erie to Toledo, and thence across the northerly portion of the state, and has a number of intermediate branches. A large majority of its capital stock is owned by the New York Central. The Chesapeake & Ohio extends from Old Point Comfort to Cincinnati, running generally along the south side of the Ohio River from a point east of Huntington, W. Va., to and through Kentucky to Cincinnati, and also has a number of intermediate branch lines. It owns a great majority of the stock of the Chesapeake & Ohio Railway of Indiana, and so reaches Chicago. Thus one of these east and west trunk lines passes through Ohio near its northerly boundary, and the other along the south shore of the Ohio river near the south boundary of Ohio. Two of the remaining defendant railroads are wholly within Ohio, running generally in a north and south direction, viz., the Hocking Valley from Toledo by way of Columbus, Lancaster, Logan, and Gallipolis to Pomeroy on the Ohio river (passing through Kanauga on the Ohio river opposite Point Pleasant, W. Va.), with a branch line running from Logan to Athens; and the Toledo & Ohio Central has two divisions running from Toledo, one by way of Fostoria, Bucyrus, and Thurston to Corning in Perry county, and the other by way of Findlay, Kenton, and Columbus to Thurston on the first division. The Kanawha & Michigan runs south from Corning to the Ohio river, crossing the river from Kanauga, Ohio, to Point Pleasant, W. Va., and continuing thence through Mason, Putnam, Kanawha, and Fayette counties by way of Charleston to Gauley Bridge, in that state, using the tracks of the Hocking Valley between Hobson and Gallipolis, by way of Kanauga; and the Zanesville & Western runs east and west from Thurston through the counties of Fairfield, Perry, and Muskingum to Zanesville, Ohio, although it seems to be part of an old road which formerly continued westwardly from Thurston to Columbus, parallel with the Hocking Valley.

*The Coal Fields.* The Ohio coal fields directly in question are situated in Athens, Perry, Hocking, and Muskingum counties, and known as the Hocking Valley coal fields; and those in West Virginia are situated in the Kanawha coal district. The four railroads last named are connected with portions of these coal fields of Ohio, and the Kanawha & Michigan with the Kanawha coal fields. The principal coal mines along the Hocking Valley are located in Athens, Perry, and Hocking counties, those along the Toledo & Ohio Central are in Fairfield, Perry, Hocking, Athens, and Muskingum, those along the Zanesville & Western are in Muskingum and Perry counties, and those along the Kanawha & Michigan are in Putnam, Kanawha, and Fayette coun

ties, W. Va., besides some that are located in Perry and Athens counties, Ohio; and the principal part of the freight traffic of all the defendant railroad companies, except the Lake Shore, is bituminous coal in car load shipments, the principal mines along the Chesapeake & Ohio being in Kanawha, New River, and Big Sandy districts of West Virginia and Kentucky. A large part of the freight traffic of the Lake Shore is bituminous coal in car load shipments derived from branch roads tapping the Appalachian coal fields. The coal of the various fields mentioned is shipped on these roads from the portions of coal fields with which they are severally connected as before pointed out, to lake ports and to points in the North and Northwest.

[1] *Competitive Conditions.* The Hocking Valley and the Toledo & Ohio Central, when the latter and the Kanawha & Michigan are operated as they were for a long time as a through line, are naturally competing roads. However, evidence was offered to show that the river division of the Hocking Valley, running from Logan to Kanauga (and thence to Pomeroy, as stated), cannot be treated as a competitor of the Kanawha & Michigan, because of difficult grades on such river division. The Hocking Valley, as far south as Athens, and the Toledo & Ohio Central, are naturally competing roads. It is to be noted, however, that claim is made that competing relations cannot be ascribed to roads connected as these all seem to be with different sets of coal mines, even where such mines are located in the same coal field. As it seems to us, a broader view than this must be taken. The destinations of the coal shipped from these coal fields and the effect on the prices to be exacted of the coal purchasing and consuming public located at points beyond the lake ports and the boundaries of Ohio must be taken into consideration; and not merely the producers of coal and the carriers transporting it. Manifestly it can make no difference to the coal purchaser or consumer whether coals of the same quality be derived from one particular mine or another of the same field, no matter how close together or how far removed from one another such mines may be, so long as the prices of the coals and the freight charges to be paid are influenced by natural competitive conditions both at the mines and in transportation; and the right to have such conditions maintained cannot be validly abridged through arbitrary or unusual methods. This is equally plain respecting coals of different qualities originating in different fields and requiring varying distances of transportation over lines naturally competing in material parts; for the purchaser or consumer will obviously select the coal according to his particular needs or ability to sell or to pay.

It must follow that mere differences in locations of coal mines within the same general field, as well as differences in quality owing to differences in fields, cannot rightfully be made the basis for eliminating effective competition as between railroads traversing substantially the same territory along parallel lines from neighboring mines of the same coal field, or even of different coal fields, to the same general destinations; and the evil effects upon competition concerning railroads and coal mines so related are accentuated wherever a union of interests is created and maintained between such producers and car-

riers of coal, particularly where producers and carriers through artificial methods become practically one and the same. If these views are at all applicable to a case such as this, the Kanawha & Michigan, when employed as a carrier exclusively in connection with either the Toledo & Ohio Central or the Hocking Valley, may, we think, be safely treated as a natural competitor of the one or the other of such roads, according as the connection may exist; because the destinations of its coal in either event are, in, any rational competitive sense, the same as those of the other road respecting the coal originating on its line. It results (1) that traffic originating on either the Hocking Valley or the Toledo & Ohio Central should be accorded the benefits of free competition; (2) that when coal originating on the line of the Kanawha & Michigan is carried in part over both of these other roads to destinations beyond Ohio, as also coal originating on that road in West Virginia and destined to common points within Ohio, it is to the interest of the Kanawha & Michigan actually to employ the legitimate advantages arising from its opportunity to forward such coal (and this forms the great bulk of its traffic) over either of the other roads. The issue in a general sense is whether these competitive conditions have been suppressed; and the situation is further complicated by uniting coal interests with the railroad interests proper.

[2] *Combination and Conspiracy—Alleged Origin and Continuation.* The combination and conspiracy averred originated in 1899 and have been continued in one form or another ever since. What happened between that time and the year 1909 resulted in a suit in quo warranto by the state of Ohio against the Hocking Valley. State ex rel. v. Railway, 12 Ohio Cir. Ct. R. (N. S.) 49, 145. The first decision in that case was rendered April 24, 1909, and upon rehearing adhered to July 21st of that year; and on January 18, 1910, the court made a finding of facts, with separate conclusions of law thereon (set out in the present record), in terms ousting the Hocking Valley from the power of owning and holding shares of stock in the Kanawha & Michigan, the Buckeye Coal & Railroad Company, the Sunday Creek Coal Company, the Sunday Creek Company, and the Continental Coal Company; from the power of guaranteeing bonds of the Continental Coal Company; from exercising control or management of the Kanawha & Michigan, the Toledo & Ohio Central, the Zanesville & Western, and the coal companies before mentioned; and from performing a certain contract between it, the Toledo & Ohio Central, and the Continental Coal Company for division of freight between such railroads. It was adjudged, also, that the road of the Toledo & Ohio Central for its entire length is parallel to and competitive with the road of the Hocking Valley from Toledo to Logan; that the roads of the Hocking Valley and the Kanawha & Michigan are parallel lines between Logan and Corning respectively and the Ohio river; and that the Kanawha & Michigan and Toledo & Ohio Central together are competitive with the entire line of the Hocking Valley. This judgment was allowed to become final.

In March following the Lake Shore and the Chesapeake & Ohio entered into an agreement (sometimes referred to by the parties as the

Schaff-Stevens agreement and sometimes as the agreement of March 12th, and again of March 17th), which has become the subject of a controlling issue in the present cause. Indeed, the government's position is that the operation and effect of this agreement, with what has been done under it, have been to continue the scheme so condemned by the judgment of the Ohio Circuit Court; while that of the defendants is that the agreement is valid, and that the acts of the parties thereto and of all the other defendants, since the date of the agreement, have in no wise been repugnant to any federal statute. It is not claimed that the issues determined in the state quo warranto suit are decisive of issues concerning interstate commerce; but it is urged that, apart from the state case, interpretation of the March agreement and of the conduct of the parties to it and those directly affected by it is distinctly aided by looking into the conduct of those who were interested in the properties before the agreement. Stated otherwise, the contention is that a view of the situation existing before the agreement and of the situation that has since existed cannot but be helpful to a proper solution of the controversy.

We do not propose to recite or discuss all the details of either situation, for such a course would occupy far too much space, and, moreover, is not necessary. If the locations and connections of the railroads and their relations to the coal properties are recalled, as before pointed out, it will not be difficult to apply the controlling features of the evidence adduced on the one side to prove, and on the other to disprove, the alleged combination and conspiracy and continuation thereof. In 1899 a plan for the reorganization of the Columbus, Hocking Valley & Toledo Railway Company (predecessor of the Hocking Valley) was entered into under date of January 4th, and direction of J. P. Morgan & Co. After judicial sale of the railroad property of the company, the purchasing trustees at such sale conveyed this property to the Hocking Valley, and the title thereto is still in that company. It was part of this plan to have the Hocking Valley acquire interests in the Toledo & Ohio Central and the Columbus, Sandusky & Hocking Railroad Companies, or successor companies, and in February, 1899, the stockholders of the Hocking Valley adopted a regulation reserving 50,000 shares of its preferred and 50,000 shares of its common stock for the purpose of acquiring such interests. These reserved shares were from time to time listed on the New York Exchange at the instance of the Hocking Valley and for the express purpose of acquiring such interests. The purchases of the stock in the Toledo & Ohio Central were made in the name of a New Jersey corporation, called the Middle States Construction Company, which was organized in February, 1899, for that purpose. In 1899 and 1900 the Hocking Valley, through the issue of over $8,000,000 of its reserved preferred and common stock, purchased the bonded indebtedness of this construction company; and this indebtedness was secured by and convertible into the stock of the Toledo & Ohio Central, under a deed of trust of the Construction Company to the Central Trust Company of New York. Through the issue of the remainder of its reserved stock, the Hocking Valley, in 1902, purchased all the stock in

and all the bonds of the Zanesville & Western, which through judicial sale had acquired the portion of the Columbus, Sandusky & Hocking Railroad extending from Thurston, in Fairfield county, to Zanesville, in Muskingum county, with certain branch lines. It is not definitely shown when and in what amounts the purchases of the stock in the Toledo & Ohio Central were made; but it appears by stipulation that the Construction Company, in the years 1899 and 1900, acquired 58,-921 shares of such stock, and the listing papers before mentioned show that the total issue of stock of the Toledo & Ohio Central was 102,080 shares, preferred and common. Moreover, from 1902 to 1909 the president and general manager of the Hocking Valley, not to speak of other officers selected later, occupied corresponding positions in the Toledo & Ohio Central and the Zanesville & Western. The control thus signified in the Hocking Valley carried with it also the control of the Kanawha & Michigan. In 1890 the Toledo & Ohio Central acquired 45,000 shares, and in 1899 an additional 100 shares of the capital stock of the Kanawha & Michigan, constituting a majority of that company's outstanding capital stock, and these two roads were operated practically as a through line; and, further, as early as February, 1891, the former guaranteed the 100-year bonds of the latter at the rate of $10,000 a mile for 134 miles, or $1,340,000, and thereafter advanced it moneys from time to time. Further, in 1903, the Hocking Valley exchanged its holdings of stock and bonds in the Zanesville & Western for the shares held by the Toledo & Ohio Central in the Kanawha & Michigan. Thus the Hocking Valley attained practical control of the two parallel systems of railroad between Toledo and the Ohio river, including the Zanesville & Western; and, apart from influence exerted by certain trunk lines alluded to later, the Hocking Valley alone remained in control of this entire system of railroads until the execution of the agreement of March 12, 1910.

We shall gain a better knowledge of the situation as it existed prior to the March agreement, if at this point we look further into the coal fields, which were tributary to this system of roads and especially into certain portions of such fields that were under the practical control of the Hocking Valley. Much evidence was offered upon this subject, and some of it is clarified by admissions contained in some of the pleadings. By several methods the Hocking Valley procured control of large coal properties both in the Hocking and Kanawha fields. Pursuant to the plan of reorganization of 1899, that company and the Buckeye Coal & Railway Company were incorporated under the laws of Ohio, February 25, 1899, and thereafter they joined in the execution of a mortgage under date of March 1st following, providing for the issue of first-mortgage bonds in the sum of $20,000,000, and secured by the properties acquired by such companies. This coal company was organized for the purpose of acquiring the coal properties of the Hocking Coal & Railroad Company, and these properties were bid in and conveyed to the Buckeye Coal & Railway Company by the purchasing trustees at the judicial sale; and such trustees received from the new coal company 2,495 shares of its total capital stock of 2,500 shares, and thereupon entered into a traffic agreement with the Hock-

ing Valley to secure rail connections between coal mines and the main railroad line and also coal transportation, and the trustees at the same time turned over the stock in the coal company to the Hocking Valley. Out of the sales proceeds of the first mortgage bonds mentioned the Hocking Valley acquired the stock and properties of the Ohio Land & Railway and the New York & Western Coal Companies, which had belonged to and been controlled by the Columbus, Hocking Valley & Toledo Railway Company; also all the stock in the Boston Coal, Dock & Wharf Company and the Rabould Coal Company; also a majority of the preferred and likewise of the common stock of the Sunday Creek Coal Company, and afterwards the Hocking Valley increased its holdings in that company to 12,963 shares of preferred and 19,400 shares of common out of a total issue of 15,000 shares of preferred and 22,500 of common.

A different method was adopted for securing control of the Kanawha Hocking Coal & Coke and the Continental Coal Companies, as also quite a number of other coal properties to which we shall refer in a moment. The Toledo & Ohio Central and the Hocking Valley entered into a contract to guarantee first-mortgage bonds of the coal companies last named, the details of which are not essential to an understanding of the case. It suffices to state that agreements were made under which syndicates were formed to underwrite bonds of the companies ($3,-250,000 par value in all of the first company and $3,023,000 par value in all of the second company); the Toledo & Ohio Central and the Hocking Valley guaranteeing payment of such bonds, but the Hocking Valley assuming the entire obligation as between it and the other guarantor company. In connection with these guaranties the coal companies agreed to deliver all their coal to the Kanawha & Michigan for transportation, and by further agreement such coal was to be equally divided between the Hocking Valley and the Toledo & Ohio Central and so carried northwardly and beyond the Ohio terminus of the Kanawha & Michigan, and the Kanawha & Michigan agreed to purchase all its fuel coal from the coal companies at a price at least 20 cents per ton above production cost. The stock of these two coal companies and certain beneficial certificates of the first company were issued to J. P. Morgan & Co. to secure performance of these contracts of guaranty. The bonds so guaranteed were sold and large portions of the proceeds were used to purchase coal properties of 28 owners (consisting mostly of companies) at prices varying from $8,875 to $541,125 and aggregating $5,194,940.04. The remainder, after paying organization expenses, was placed in the treasuries of the coal companies. Further, the Toledo & Ohio Central owned the entire capital stock of the Imperial Coal Company and also the National Coal Company; the former being $300,000 and the latter $160,000 par value.

We are unable to discover from the evidence the acreage of these coal lands or their precise locations. An estimate made by the vice president of the Sunday Creek Company, of its unmined coal acreage on December 31, 1910, showed that there were 42,710 acres in Athens, Perry, and Hocking counties of Ohio and 33,000 in Kanawha and Fayette counties of West Virginia. But in July, 1905, the Sunday

Creek Company (not the Sunday Creek Coal Company, another subsidiary company of the Hocking Valley) was organized under the laws of New Jersey with an authorized capital stock of $4,000,000 for the purpose of engaging in business in the state of Ohio and owning and developing lands containing coal and other minerals. It is averred in the bill that the Sunday Creek Company controls more than 100,000 acres of land, including about 50 mines and about 350 coke ovens, and owns the beneficial certificates of the Continental Coal Company and the Kanawha & Hocking Coal & Coke Company; and these averments are admitted in the answer of the Sunday Creek Company, as also in the joint answer of the Hocking Valley and the Chesapeake & Ohio, and the coal property held by the Sunday Creek Company seems to comprise all the coal properties so accumulated as before shown. At the time of the incorporation of the Sunday Creek Company the Hocking Valley exchanged $3,236,300 par value of the stock it held in the Sunday Creek Coal Company for the same amount of stock of the Sunday Creek Company; and the Toledo & Ohio Central exchanged 2,037 shares of the preferred and 3,100 shares of the common stock it held in the Sunday Creek Coal Company for a like amount of the stock of the Sunday Creek Company. Thus the Hocking Valley and the Toledo & Ohio Central, in the proportions mentioned, acquired $3,750,000 par value of the total of $4,000,000 par value of the capital stock of the Sunday Creek Company; and on April 23, 1906, 2,488 shares were ordered to be issued in a single certificate in the name of the Central Trust Company of New York, to the end that they would not be issued except with its approval, the remaining 12 shares having apparently been issued as qualifying shares for directors.

*The Trunk Lines' Purchase of a Majority of the Hocking Valley Capital Stock.* Prior to the merger so made of the coal interests of the Hocking Valley, to wit, June 29, 1903, five of the trunk line railroads, viz., Lake Shore & Michigan Southern Railway Company, Erie Railroad Company, Baltimore & Ohio Railroad Company, Chesapeake & Ohio Railway Company, and the Pittsburgh, Chicago, Cincinnati & St. Louis Railway Company, entered into an agreement with J. P. Morgan & Co. to purchase from that company 69,242 shares of common capital stock of the Hocking Valley at a price and upon terms specified; Morgan & Co. having "arranged to borrow the moneys forthwith to make payment for said shares to the depositors under a syndicate agreement dated December 4, 1902." Morgan & Co. were to carry the loan for the benefit of the purchasing companies for three years; and such purchase was completed. The aggregate purchase price was $7,270,410, and each of the purchasing companies obtained one-sixth interest in the shares so purchased, except the Pittsburgh, Chicago, Cincinnati & St. Louis, which acquired two-sixths. As indicative of the effect of this upon the policy of the Hocking Valley, it is sufficient to state that an advisory committee (composed of representatives of the trunk lines) and the president of the Hocking Valley had frequent conferences relative to the financial affairs of the Hocking Valley and the coal companies in which it was interested, and the introduction or not of track connections between the lines

of the Hocking Valley system and the independent coal mining operators and the like. Among the results of these conferences were the incorporation of the Sunday Creek Company for the purpose of handling the coal interests of the Hocking Valley, as before pointed out, and maintaining an operating system that was satisfactory to the trunk lines. One of the features of this operating system was to restrict rail connections with coal mines to such as were already in operation, and to refuse and by litigation to contest applications for rail connections with new mines. These conditions were in practical effect continued until the agreement of March, 1910.

*Shares of Capital Stock in the Sunday Creek Company Placed in Names of Trustees.* It should be stated here that, when the Sunday Creek Company was organized, the 5,137 shares of stock in that company, which belonged to the Toledo & Ohio Central, were issued in one certificate in the name of John H. Doyle, as trustee, who indorsed the certificate in blank and delivered it to the vice president and general manager of the Toledo & Ohio Central; and, further, in April, 1908, just before the commodities clause of the Hepburn Act was to take effect, it is testified that such stock was sold to him to be held as trustee for the stockholders of the Toledo & Ohio Central, in whose names its stock might from time to time be registered on the books of the company, and to whom any dividends should be paid. This arrangement was effected through the redelivery of the old stock certificate to the trustee, from which he at the time erased his original indorsement, and a contract executed by him and the Toledo & Ohio Central bearing date April 30, 1908; and this certificate and contract are still in his possession. After the date of this contract the trustee on two or three occasions issued a proxy to the president of the Sunday Creek Company, at his request, to vote the stock at annual meetings; but the trustee has not received any request or any suggestion from the Toledo & Ohio Central, or the officers of any other railroad company, with respect to the giving of proxies or the voting of the stock. On April 30, 1908, another contract, similar to the one so made between John H. Doyle and the Toledo & Ohio Central, was entered into between the Hocking Valley and the Central Trust Company of New York, respecting the shares of the Hocking Valley in the Sunday Creek Company. After reciting that the Hocking Valley is the owner of 32,375 shares of the Sunday Creek Company (also, among other things, that all these shares with others were pledged through a trustee as collateral security for the bonds issued under the first consolidated mortgage of the Hocking Valley and the Buckeye Coal & Railway Company, and that in view of the penalties imposed for violation of the Hepburn Act (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1911, p. 1288]) and of a desire to obey the law if constitutional, and at the same time to preserve to the owners of the capital stock of the railway the equity in such coal properties, which could not be disposed of by reason of such pledge), it was agreed that the railway company had sold and assigned to the trustee all its interest in such shares of stock, subject to the lien of the mortgage and the rights of the bondholders thereunder, in trust, for the proportionate benefit of the holders

of record of the stock of the Hocking Valley and for any distribution of its assets; that the trustee should have the right to vote the shares of stock at all meetings of stockholders of the company, to collect dividends, and (if the Hocking Valley is not in default under its mortgage) to distribute them among the holders of the stock. The only other provisions of the contract so made with John H. Doyle and the Central Trust Company that need be noticed are set out in the margin.[2]

Nothing further has been done with the stock of the Sunday Creek Company, and no sale or other disposition of the coal properties has been made in pursuance of these trusts or otherwise. The railroad control of the coal interests remained practically the same, at least until the date of the March agreement, as it was before.

*Conclusion Respecting Situation Prior to March Agreement of 1910.* We are bound to hold that the situation described was indefensible under the Anti-Trust Act; indeed, no attempt has been made here to justify it. It is quite plain that by the reorganization commenced in 1899 and the course pursued thereafter until the trunk lines obtained their interests in the Hocking Valley the purpose was to unite and hold the four railroads,[3] and their several coal interests under a single controlling power; and we are satisfied from the evidence that this design was consummated at the instance of such companies, and finally rendered more secure through the interests and indirect control of the trunk lines. One of the reasons offered to induce and defend the reorganization was the existence of "undue and bitter competition." After stating that the principal business of the Columbus, Hocking Valley & Toledo (the predecessor of the Hocking Valley) was the transportation of bituminous coal from mines on adjacent property, it was declared that the business was strictly and intensely competitive,

---

[2] "In the event, however, that the said Supreme Court shall decide said commodity clause of said Hepburn Act constitutional, then said trustee shall dispose of the equity in said coal stocks sold and assigned to it in trust for the purposes of this agreement (subject, however, to the lien of the first consolidated mortgage, and its rights as pledgee trustee thereunder), when and as directed in writing by the persons, firms or corporations holding and owning of record a majority in amount of the stock of the Railway Company as hereinafter provided, and when such sale or distribution is made by the trustee hereunder, and the entire proceeds, whether of stocks, bonds, moneys, or other securities, shall have been actually paid to and received by the said trustee, then the said trustee shall distribute, less its proper charges and expenses, all such proceeds in kind received from the disposition of said stocks, among such persons, firms and corporations, their successors and assigns, as shall be stockholders of record of the Railway Company on the first day of the months in which said proceeds and all of them shall have been finally received, pro rata in proportion to their said record holdings of stock of the Railway Company. Any such sale or disposition, however, it is understood shall be made subject to the lien of the first consolidated mortgage thereon and to all the terms and conditions of the said mortgage, and only in the event that said Railway Company is not then in default of any requirement of said mortgage."

[3] The Columbus, Hocking Valley & Toledo, the Toledo & Ohio Central, the Columbus, Sandusky & Hocking, and the Kanawha & Michigan Railway Companies.

and that the field in Ohio was covered by seven railroad lines (including in their number the lines of the present·Hocking Valley, the Toledo & Ohio Central, and the Columbus, Sandusky & Hocking, the predecessor of the Zanesville & Western), and that of these seven lines three operated in one district and the other four lines in a field lying east of that district. The three lines so alluded to could have been no others than the exclusively Ohio lines now in question. It was further declared that, in addition to the competition above indicated, the situation was complicated by the fact that of late years the West Virginia coals were rapidly supplanting the Ohio coals in the markets reached by the latter. And, in short, the evidence fairly shows that the union of interests so induced was carefully developed, and that its inevitable tendency and effect were to combine and monopolize the stocks and interests of these railroad companies and coal companies, and so to stifle competition in restraint of trade among the states within the settled meaning of the Anti-Trust Act.

[3, 4] *The Conditions Created by and Maintained Since the March Agreement.* Has the situation described been so changed by or under the agreement of March 12, 1910, as to entitle defendants as they claim to a dismissal of the bill? They forcibly urge that what was done prior to the March agreement has nothing to do with what has been done since. Objections were continuously made to the introduction of evidence tending to show conditions existing before the agreement. Complainant insists that what followed the execution of the March agreement was but a continuation of what preceded it. The fact that we have considered the evidence shows, of course, that we regard it as admissible. It cannot escape notice that some of the defendants were parties to such earlier transactions, and that others acquiesced in and adopted such transactions before the March agreement was made. Lincoln v. Claflin, 74 U. S. (7 Wall.) 132, 138, 19 L. Ed. 106; United States v. Standard Oil Co. (C. C.) 152 Fed. 290, 294, per Sanborn, Circuit Judge, and Circuit Judges Van Devanter,. Hook, and Adams concurring. The acts and transactions of the first period therefore ought to aid in some measure to elucidate the intent and effect of the March agreement, and of the acts and transactions of the parties since, no matter what conclusion may be reached touching the second period. Standard Oil Co. v. U. S., 221 U. S. 1, 76, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; Darius Cole Transp. Co. v. White Star Line, 186 Fed. 66, 108 C. C. A. 165 (C. C. A. 6th Cir.); U. S. v. E. I. Du Pont De Nemours Co. (C. C.) 188 Fed. 128, 134.

[5] *The March Agreement.* The agreement was signed by the Lake Shore and the Chesapeake & Ohio, and, so far as now material in substance provided, that the Lake Shore would purchase from the Hocking Valley the bond it held of the Middle States Construction Company, which as stated was exchangeable for the entire capital stock of the Toledo & Ohio Central (such stock to carry with it, for the benefit of the Toledo & Ohio Central, the ownership of 45,100 shares of stock in the Kanawha & Michigan, 5,137 shares of stock in the Sunday Creek Company, and the entire capital stock in and all the bonds of the

Zanesville & Western) at an aggregate purchase price of $10,197,874.67; and would make provision for loaning to the Sunday Creek Company as needed and on its notes $1,143,110.50. Such purchase to be coupled with an agreement that a contract for 25 years would be made and should provide that the line of the Hocking Valley and the line of the western division of the Toledo & Ohio Central, between their terminals at Toledo and their connections with the Kanawha & Michigan at Chauncey, might (for cost alone of maintenance and operating expenses according to joint usage) be used at the option of either for the movement of its through freight trains; that an additional agreement should be made to protect the Toledo & Ohio Central and the Hocking Valley under their previous guaranty of bonds of coal companies, and given (as before stated) under an agreement for an equal division of the coal traffic derived from the properties of such coal companies; that an arrangement for distribution of the business, so far as could legally be made, should be effected to protect the interests of the Toledo & Ohio Central and the Hocking Valley respecting their guaranty of such coal bonds. Upon making such purchase, the Lake Shore was to sell to the Chesapeake & Ohio 22,550 shares of the Kanawha & Michigan for $1,623,600 and 11,540 shares of the Hocking Valley for $1,384,800 (which latter stock seems to have been the one-sixth interest that the Lake Shore acquired at the time of the purchase made by the trunk lines). Still another contract was to be made "for trusteeing or otherwise jointly handling" the 45,100 shares (a majority of the stock and called the "controlling interest then to be owned by the two companies") in the Kanawha & Michigan. In case the stock was so placed in trust, provision was to be made for such trackage agreements with the Kanawha & Michigan as would protect the purchasing companies against loss of control of the property. Privilege was to be given to make certain connections between the Kanawha & Michigan Railway with the Virginian Railway or with the Lake Shore or Chesapeake & Ohio, the intent being that the lines of the Kanawha & Michigan could be used to the fullest extent by either of the purchasing companies in building up its interest either in local territory on the Kanawha & Michigan or in making through routes and connections beyond it, protecting, however, all the stockholders of that company. Provision was also made for acquiring all or part of the outstanding stock of the Kanawha & Michigan; for having the Kanawha & Michigan purchase the securities of the Pomeroy Belt Railway Company and indemnifying the Hocking Valley against liability assumed by it in the purchase thereof and granting to it a trackage right over such belt road, etc., for securing to the Hocking Valley trackage between Athens and Hobson over the Kanawha & Michigan for Hocking Valley through business from or to its line between Galliopolis and Pomeroy. The whole agreement was made subject to a condition that the other roads embraced in the trunk line purchase, before pointed out, should sell their holdings in the stock of the Hocking Valley to the Chesapeake & Ohio.

The Chesapeake & Ohio thereupon acquired the holdings of the other trunk lines of Hocking Valley stock, which, with the one-sixth it had

previously obtained through the trunk lines syndicate purchase and the one-sixth derived under the March agreement, gave to the Chesapeake & Ohio 69,240 shares of such stock. The preferred stock of the Hocking Valley was retired in April, 1910, leaving 110,000 shares of common, of which the Chesapeake & Ohio now owns (through increase of its holdings) 88,258 shares, and that company and the Lake Shore now each own 40,271 shares of the stock of the Kanawha & Michigan (being 80,542 of a total capital of 90,000 shares). The result is that, instead of five trunk lines holding as formerly, only two, to wit, the Lake Shore and the Chesapeake & Ohio, now hold the controlling power, it is true through independent ownerships, in the Hocking Valley, the Toledo & Ohio Central, the Kanawha & Michigan, the Zanesville & Western, and also (subject to the trusts and pledge before stated) the Sunday Creek Company. Their interests in the Sunday Creek Company cover its entire outstanding capital stock (included in this are the 12 qualifying shares belonging to the Hocking Valley).[4]

Now it is to be observed of the March agreement that its avowed purpose was not to avoid violation of any federal act, but to comply with the decree of the Ohio Circuit Court in the quo warranto case. Such a purpose might, it is true, be entirely consistent with the federal Anti-Trust Act; but whether this was so here must be tested by the intent to be inferred both from the agreement and the extent and nature of the control thereby secured over the railroads and the coal traffic and other commerce dependent on them (United States v. St. Louis Terminal, 224 U. S. 394, 395, 32 Sup. Ct. 507, 56 L. Ed. 810); and such intent and control may, we think, be further ascertained from comparison of important features of the situation existing before the agreement with some of those found in the situation created under it. In applying these tests, it should be stated in the outset that the government has failed in several respects to sustain the averment that there has been since the agreement a continuation of the same conditions as those existing before. Admittedly a change in the ownership of the stocks and bonds of the railroads has been made under the agreement, as before pointed out; and it must be conceded under the evidence adduced that the independent coal operators in the coal fields in question have received greater concern and accommodations at the hands of the railroads since the agreement than they were given before. But we are convinced that the changes so wrought in ownership of stocks have resulted in a concert of action and control of the railroads and coal interests secured by the agreement, which is inconsistent with the rule requiring freedom of competition in commerce among the states; and that rule is too firmly established to be shaken by argument against the beneficial results ascribed to it. United States v. Union Pacific R. R. Co., 226 U. S. 61, 87, 88, 33 Sup. Ct. 53, 57 L. Ed. ——; United States v. St. Louis Terminal, supra, 224 U. S. 401, 32 Sup. Ct. 507, 56 L. Ed. 810; Loewe v. Lawlor, 208 U. S. 274, 293, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Northern Se-

---

[4] Compare holding shown by stipulation (Rec. 572), with holding stated in Exhibit E, to bill.

curities Co. v. United States, 193 U. S. 331, 332, 24 Sup. Ct. 436, 48 L. Ed. 679; Pearsall v. Great Northern Railway, 161 U. S. 646, 676, 16 Sup. Ct. 705, 40 L. Ed. 838; United States v. E. C. Knight Co., 156 U. S. 1, 16, 15 Sup. Ct. 249, 39 L. Ed. 325; Chesapeake & O. Fuel Co. v. United States, 115 Fed. 619, 620, 53 C. C. A. 256 (C. C. A. 6th Cir.); United States v. Standard Oil Co. (C. C.) 173 Fed. 177, 188 (C. C. A. 8th Cir.).

Evidence was adduced to show that, owing to litigation and other causes, some of the provisions of the March agreement have not been carried out; and some of the evidence tends to show that, if all its provisions had been carried into effect, it would have resulted beneficially to the volume of traffic and those interested in it along the lines of the roads in question. This does not indicate a purpose not to carry out the March agreement ultimately; but it does show that a virtual consolidation of all these naturally competing roads (coupled with the division of the coal traffic provided for), so far as concerns the through traffic in coal to the lakes, is necessary to accomplish the result stated, although it does not purport to show how long such increase in volume would last. It is contended by learned counsel, however, that all the provisions of the agreement are valid and enforceable, so long at least as the interested stockholders themselves are satisfied with its performance.

Moreover, evidence was offered to show that the Ohio roads are controlled and operated independently of one another and of either the Lake Shore or the Chesapeake & Ohio or both; and similarly as respects the Sunday Creek Company, and all these roads either collectively or separately. It is true that the officers of the railroads and the railroad offices are distinct, and this is true of the Sunday Creek Company; also that the managerial officers of these subordinate companies have been instructed to exercise their own judgment respecting the interests they represent, and yet the natural and probable effect of all this needs but little consecutive thought. Such officials are at last dependent for their positions upon the will of the two trunk line companies controlling the stocks; and it is vain to say that such officers do not become sensitive to the interests and policies of the real masters of the situation. Illustrations of this, as also of the effect of the new régime upon interstate commerce and trade, are contained in the evidence relating to both the coal and railroad properties. We have seen that the Sunday Creek Company still holds the same title to the coal properties that it held before the execution of the agreement of March, 1910; and that the Chesapeake & Ohio and the Lake Shore together have been brought into the same relation to the entire capital stock of this coal company that the Hocking Valley alone previously bore to it.[5] In the March agreement no allusion was made to the trust agreements under which the stock of the Sunday Creek Company was on

[5] It should be stated that as early as June, 1905, provision was made by the Sunday Creek Company for purchasing certain trust certificates representing the beneficial interests in the stock of the other two coal companies which are parties to this cause, and this arrangement seems to have been carried out.

April 30, 1908, placed in the names of trustees. The shares placed (rather continued) in the name of John H. Doyle, as trustee, were in the March agreement treated as the property of the Toledo & Ohio Central; and the same general policy concerning the coal handled by the Sunday Creek Company that prevailed before the March agreement has been pursued since. This has resulted in the continuance of an equal division substantially of the coal traffic originating on the Kanawha & Michigan between the Hocking Valley and the Toledo & Ohio Central. All the coal carried in Kanawha & Michigan equipment is so divided. While the coal that is carried in the equipment furnished by the other two companies respectively is divided according to such equipment, yet it would seem from the correspondence and testimony that the desire and effort are to equalize either the cars received or the advantages and consequent profit of transportation, say as between coal and coke, since coke appears to yield more freight revenue to the carrier than coal. Further, some of the evidence (concerning at least the conduct of the Lake Shore) discloses an apparently asserted right to demand, rather than a design simply to persuade, the allowance of such division; and seemingly the officers of the Kanawha & Michigan are disposed to yield it in the same spirit. This augments the similarity in purpose between the division now made of the coal traffic, and the division that was admittedly made prior to the March agreement in obedience to contract.

We do not overlook the testimony to the effect that this additional agreement has not been executed; but it is not perceivable how the companies can in substance do the same thing that the agreement provided for, and escape its effect on the ground either that it has not been reduced to writing and signed, or that such a division is fair. In short, our interpretation of the evidence is that this division of traffic is not due alone to a desire to be fair to connecting companies; but that it is actuated also by a purpose practically to carry out the provision of the March agreement in this behalf, and so protect the Toledo & Ohio Central and the Hocking Valley as joint guarantors "on the bonds of certain coal companies for equal division of the coal from these coal properties." Such a provision or practice is inconsistent with the statutory right accorded to shippers since 1910, say along the Kanawha & Michigan, to secure the benefit of competitive through rates by routing their own traffic by way of either the Hocking Valley or Toledo & Ohio Central, according as they might be able through perfectly legitimate means to induce the one or the other company to file and publish lower rates. See amendment to section 15 of Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), passed June 18, 1910, c. 309, § 12, 36 U. S. Stat. L. 552 (U. S. Comp. St. Supp. 1911, p. 1301), striking from amended section 15, Act June 29, 1906, c. 3591, § 4, 34 Stat. L. 590 (U. S. Comp. St. Supp. 1911, p. 1301), the limitation: "Provided no reasonable or satisfactory through route exists." That it would be entirely practicable for shippers of coal to secure, with respect to through traffic, a substantial competition with the Hocking Valley and the Toledo & Ohio Central, but for the joint ownership and control

of the Kanawha & Michigan, seems to us obvious. The president of the Kanawha & Michigan, and its general freight agent, testified, in substance, that they had made no effort to secure from the Hocking Valley or the Toledo & Ohio Central in favor of their own company a greater division of the freight rate charged for through traffic; in other words, the motive is lacking to bring about real competition between these parallel roads. Nor does it appear that the officers of either the Hocking Valley or the Toledo & Ohio Central have done anything respecting a greater or less division of the freight rate charged for through traffic. And we do not discover that the officers of the Sunday Creek Company have ever sought to induce any of these railroads to file or publish lower freight rates; and the president of the company (who has filled the office since June, 1910) testified:

"We do not do any routing  *  *  *  unless it is where coal must be delivered on one road or the other."

Further similarity between the course pursued before the March agreement and since is to be found in the "operating proposition" as it is characterized in the evidence, which "practically makes each road (the Hocking Valley and the Toledo & Ohio Central) a double track railroad." The arrangement consists of moving the north-bound through freight trains of the Toledo & Ohio Central, over the Hocking Valley railroad from Hobson to Fostoria, and of returning the south bound freight trains of the Hocking Valley over the western division of the Toledo & Ohio Central from Hickox to Columbus; and this is a continuation of the same reciprocal use that was commenced in 1901. Stress is laid both in the evidence and argument upon the economy of this interchange of facilities, since it secures easier grades over the Hocking Valley, as compared with those of the Toledo & Ohio Central, and avoids the necessity of building double tracks and of operating opposing trains over single track roads with the usual sidings. These advantages may be conceded from an operating point of view; yet the logic of it all would in the end destroy competition between parallel roads generally. The reciprocal use in this instance developed only with the noncompetitive period of these railroads. It is not meant by this that there may not be circumstances under which reciprocal trackage arrangements may to a certain extent be lawfully entered into and carried out. Nor is it meant that this trackage arrangement, standing alone disassociated from the joint ownership and control of the Kanawha & Michigan, would violate the federal Anti-Trust Act. What is meant is that this trackage arrangement, considered in connection with the other facts pointed out, tends to disclose a unity of purpose and concert of action on the part of the companies involved to maintain conditions that are inimical to effective competition. Testimony was offered to show that giving to the Chesapeake & Ohio and the Lake Shore equal interests in the Kanawha & Michigan and adding the advantages of this reciprocal use of tracks, operate to stimulate rather than to retard the transportation of coal, and, in fact, have resulted in substantial increase in volume of traffic; and, further, that, if these arrangements were broken up, the traffic in West Virginia coal would be monopolized by the Kanawha & Michigan and the Tole-

do & Ohio Central. This loses sight of the natural development of the coal fields tributary to the Kanawha & Michigan, which should occur under normal conditions. It also evades the obvious question whether, if the Kanawha & Michigan were owned and operated independently of both the Hocking Valley and Toledo & Ohio Central, and those roads were brought into competition for the traffic originating on the Kanawha & Michigan, there would not be a still greater stimulus given to interstate trade than has heretofore existed. There would, in that event, be neither reason nor opportunity for a monopoly of such traffic by the Kanawha & Michigan and Toledo & Ohio Central. The conceded easier grades of the Hocking Valley furnish adequate answer to the suggestions of such a monopoly. Pearsall v. Great Northern Railway, 161 U. S. 676, 16 Sup. Ct. 705, 40 L. Ed. 838; United States v. Union Pacific R. R. Co., supra.

Insistence is made that a number of the things complained of were in and of themselves lawful, and so, in effect we take it, their union or joint use could not become unlawful. For instance, it is urged that it would have been well within the power of the Lake Shore to purchase the entire stock of the Toledo & Ohio Central and the Kanawha & Michigan, because the Kanawha & Michigan is a continuation of the Toledo & Ohio Central. Likewise it is insisted in respect of the Chesapeake & Ohio that it possessed charter power to purchase the stock of the Hocking Valley, and that it was both its purpose and right to secure control of a railroad leading directly to the lake ports. Let these claims be conceded for sake of discussion; still, does it follow that the Lake Shore and the Chesapeake & Ohio could lawfully become joint and equal owners in the controlling portion of the stock in the Kanawha & Michigan? Could they at the same time add to this mutual control of that road the reciprocal trackage arrangement respecting the other roads, and so virtually consolidate these railroads as respects the through traffic in coal? These questions are stated, not merely with reference to the apparent violation involved of the statutory policy of Ohio respecting parallel and competing railroads (State v. Hocking Valley, 12 Ohio Cir. Ct. R. [N. S.] 66, 67, before cited), but particularly with respect to the effect that such joint ownership and trackage arrangement must have upon interstate commerce. The policy of the United States and of Ohio, as expressed by legislation and judicial interpretation, is quite as distinctly opposed to any union of ownership and arrangement involving the power to control parallel railroads or the transportation of traffic that is tributary to and must pass over one or both of them, as it is to formal consolidation of such railroads. Northern Securities Case, supra, 193 U. S. 362, 24 Sup. Ct. 436, 48 L. Ed. 679; United States v. St. Louis Terminal, supra, 224 U. S. 395, 32 Sup. Ct. 507, 56 L. Ed. 810; United States v. Union Pacific R. R. Co., supra; State v. Hocking Valley, supra. We have seen that the Ohio Circuit Court ousted the Hocking Valley from the power of owning and holding shares of stock in the Kanawha & Michigan. The Hocking Valley, it is true, does not now own stock in the Kanawha & Michigan; but the Chesapeake & Ohio does, and it also owns the controlling interest in the Hocking Valley.

The Chesapeake & Ohio thus holds stock in two roads, which are in substantial degree parallel and naturally competing. Can this result, or the results before pointed out as brought about since the March agreement was executed, be rightfully traceable to the charter powers of these two railroad companies, the one to reach the lake ports and the other the coal fields?

It cannot be that those companies can justify their separate stock purchases of the control of these roads, and also escape responsibility for the inevitable tendency of the present conditions to stifle free competition simply on the theory that the companies holding the legal titles to the roads are alone responsible for this result; for that would be to overlook, not only the manifest unity of purpose of the Lake Shore and the Chesapeake & Ohio, but also and especially their acquiescence, not to say concurrence, in the acts of the subordinate companies. This cannot be avoided, on the ground that corporate ownership of stock in railroad corporations created by a state is not interstate commerce (considered in the Northern Securities Case); nor, in the present instance, by the fact that capital stock in two of the competing roads is held separately by two corporations instead of one corporation; for the other matters involved here, or anything like them, were not present in the Northern Securities Case. To ignore such matters would be to furnish an easy method to frustrate the statutory inhibitions in question. Indeed, if these two purchasing companies are not in effect equivalent to a committee to regulate rates, certainly the subordinate railroad companies under their control are, within the meaning of the concurring opinion of the late Justice Brewer, in the Northern Securities Case. When speaking of the single holding company in question there, the learned justice said (193 U. S. 362, 24 Sup. Ct. 467, 48 L. Ed. 679):

"In this case it was a mere instrumentality by which separate railroad properties were combined under one control. That combination is as direct a restraint of trade by destroying competition as the appointment of a committee to regulate rates."

If the intention of placing the ownership of the stocks in question in the Lake Shore and the Chesapeake & Ohio can be rightly inferred from what has actually been done since, "the purpose to combine and by combination destroy competition" (Northern Securities Case, 193 U. S., at page 362, 24 Sup. Ct. 467, 48 L. Ed. 679) existed when the March agreement was executed, quite as certainly as such purpose was held to exist in that case "before the organization of the corporation, the Securities Company." The form given to a combination is of no consequence. As the learned Chief Justice said in the Tobacco Case, 221 U. S. 181, 31 Sup. Ct. 648, 55 L. Ed. 663:

"* * * It was pointed out (in the Standard Oil Case) that the generic designation of the first and second sections of the law, when taken together, embraced every conceivable act which could possibly come within the spirit or purpose of the prohibitions of the law, without regard to the garb in which such acts were clothed."

It hardly need be said that the cases relied on by the defense, like Bigelow v. Calumet & Hecla Mining Co., 167 Fed. 721, 728, 94 C.

C. A. 13, decided by the present Mr. Justice Lurton in this court, and by Judge Knappen in the court below, have no application.

There is to be added the apparent purpose of the Lake Shore and the Chesapeake & Ohio to retain their relations with the Sunday Creek Company. The feature of the trust agreements of present importance is quoted in the margin of an earlier portion of this opinion. It provided that, in case the Supreme Court should hold the commodities clause constitutional, each trustee was to dispose of the equity in the railroad companies in the Sunday Creek stock, as directed by the holders of a majority of the capital stock of the Hocking Valley and the Toledo & Ohio Central respectively, and distribute the entire net sales proceeds among such holders. It need not be stated that the commodities clause, as construed by the Supreme Court, has been held to be constitutional. United States v. Delaware & Hudson Co., 213 U. S. 366, 29 Sup. Ct. 527, 53 L. Ed. 836; United States v. Lehigh Valley R. R. Co., 220 U. S. 257, 31 Sup. Ct. 387, 55 L. Ed. 458. The first of these cases was decided May 3, 1909, about 10 months prior to the date of the March agreement, and considerably more than a year before the commencement of this suit. It is said that such sales cannot be enforced in this case, because of infirmities in the pleadings. If in the view we take of the evidence this objection can be regarded as material (Lockhart v. Leeds, 195 U. S. 427, 436, 25 Sup. Ct. 76, 49 L. Ed. 263), we perceive no sufficient reason why at this stage of the case the objection cannot be met by amendment. Neale v. Neale, 76 U. S. (9 Wall.) 8, 9, 19 L. Ed. 590; The Tremolo Patent, 90 U. S. (23 Wall.) 527, 23 L. Ed. 97. As respects the power of the court to require such sales and distributions to be made, we think it is clearly given by section 4 of the Anti-Trust Act (26 U. S. Stat. 209; Standard Oil Case, 221 U. S. 78, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; Union Pacific Case, supra); and, if the trustees or the absent stockholders, in the Hocking Valley are indispensable parties defendant, they may be brought in (Hoe v. Wilson, 76 U. S. [9 Wall.] 501, 504, 19 L. Ed. 762; Rogers v. Penobscot Mining Co., 154 Fed. 606, 616, 83 C. C. A. 380). It is to be observed that there is no Ohio legislation authorizing railroad companies to hold shares of stock in coal companies. The Ohio Circuit Court held in the quo warranto suit before cited that the Hocking Valley was not a "kindred" corporation within the meaning of the statute empowering private corporations to hold shares of stock "in other kindred but not competing private corporations," etc. Section 8683, 4 Ohio Gen. Code, 239; 12 Ohio Cir. Ct. R. (N. S.) 59–63. If these companies are to be allowed potential control both of producing and transporting coals in 100,000 acres of coal lands, it is difficult to see why in spite of the commodities clause common carriers may not combine the benefits of transportation with the benefits arising from the control of any of the other necessaries of life, no matter in what quantities. Attorney General v. Great Northern Ry. Co., 29 Law Journal (N. S. Equity) 798, 799; approved in New Haven R. R. v. Interstate Com. Com., 200 U. S. 393, 26 Sup. Ct. 272, 50 L. Ed. 515.

The only remaining matter needing consideration is the testimony offered in open court tending to show that the grades of the southern division of the Hocking Valley are so difficult as to prevent successful movement over it of through coal trains; and, further, that by reason of the configuration of the territory adjacent to the Kanawha river there is no room for the construction of a track additional to that of the Kanawha & Michigan on the one side or to the tracks of the Chesapeake & Ohio on the other.

Decisions are cited to show that these physical conditions warrant alike disuse of the southern division for through coal service, and the joint control acquired of the stock in the Kanawha & Michigan. Among these is United States v. Union Pacific R. Co. (C. C.) 188 Fed. 102, reversed in part December 2, 1912 (226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. ——, before cited). We think the undisturbed portion of the decision below is distinguishable, and what is said in this behalf will serve, to indicate our views concerning the other cases cited in connection with it. The material points of distinction appear in certain facts: (a) The San Pedro line from Salt Lake to Los Angeles was found to be practically a continuation of the Union Pacific or (its subsidiary company) the Oregon Short Line, and not a natural competitor of any other line in question; (b) the physical obstacles encountered on the San Pedro line find no analogy here, unless it be south of the Ohio river and adjacent to the Kanawha & Michigan or a portion of the Chesapeake & Ohio, but it is not shown that connection between the Chesapeake & Ohio and the Hocking Valley is not otherwise reasonably available; (c) there was nothing in the Union Pacific Case to correspond in any way with the combined coal interests here and the relations between them and the present railroad companies. In that case the failure to build two projected parallel lines of railway between Salt Lake City and Los Angeles was held not to be violative of the Anti-Trust Act; while here, without repeating what has been said before respecting the present railroads and coal properties, the resultant fact cannot be ignored that between Toledo and Kanauga, two actually existing parallel lines of railroad have practically been converted into one line so far as respects the through traffic in coal. The disuse of the southern division of the Hocking Valley is claimed to be justified in the face of several admitted facts. It was constructed as a substantial portion of the Hocking Valley system, and there is no showing that it was not projected by experienced railroad men. At the time the reorganization was commenced in 1899, the railroad agencies concerned found that there had been undue and bitter competition in the coal traffic dependent upon the railroads operating in the Hocking field. The suppression of competition worked out through that reorganization was obviously calculated to engender neglect of either the Kanawha & Michigan north of the Ohio river, or the southern division of the Hocking Valley, as respects the movement of heavier trains. The railroad defendants here were participants in the policy that succeeded that plan of reorganization. And yet it is in effect insisted that the original plan and construction of the road, as well as its continued maintenance,

should be condemned as part of a through line and its practical abandonment for that purpose sanctioned by judicial decree.

[**6**] There is a clear distinction between the power to grant relief respecting past failure to construct one of two projected parallel lines, as occurred in the Union Pacific Case along the course of the San Pedro division, and the power to prevent the elimination of one of two parallel roads in actual existence and operation. After all, the difficulty north of the Ohio river is due alone to differences in grades, and it may be judicially noticed that grades may be changed. Delavan v. New York, N. H. & H. R. Co. (Sup.) 137 N. Y. Supp. 207, 212. It hardly would be contended, even apart from express statutory inhibition that such differences would warrant formal consolidation. It may be said of this situation as Mr. Justice Lurton said December 16, 1912, of a situation involved in the cases of the Reading Company concerning prices of coal at the seaboard, that "the situation is therefore one which invites concerted action and makes exceedingly easy the accomplishment of any purpose to dominate the supply and control the prices" of coal at the lake ports and beyond. The paramount evil here is the joint ownership of the Kanawha & Michigan, and, so long as that continues, effective competition will we think remain impossible. Effective competition is not limited alone to a matter of freight rates. It embraces a variety of other subjects, such as quality and promptness and sufficiency of service both as to equipment and roadbed, which are dependent above all upon separate and independent ownership or control alike of the competing roads and of the commerce under compulsion to use them. Surely the necessity to maintain such conditions as these is not affected, as claimed, by anything contained in the act to regulate commerce; for plainly that act was not intended to supplant either the settled rule respecting freedom of competition or the purpose of the Anti-Trust Act to deal with corporate ownerships or agreements that constitute barriers to such competition.

In the Northern Securities Case, after declaring the comprehensive character of the statute, Justice Harlan expressed the prevailing general rule, as we understand it, thus (193 U. S. 332, 24 Sup. Ct. 454, 48 L. Ed. 679):

"That to vitiate a combination, such as the act of Congress condemns, it need not be shown that the combination, in fact, results or will result in a total suppression of trade or in a complete monopoly, but it is only essential to show that by its necessary operation it tends to restrain interstate or international trade or commerce or tends to create a monopoly in such trade or commerce and to deprive the public of the advantages that flow from free competition."

Are the averments of the bill charging continuance in different form of the combination begun in 1899, so far supported by the proofs offered in that behalf as to justify the granting of relief touching the situation created by and under the March agreement? Comparison of that agreement and what has been done under it, with the first situation, cannot we think fail to show material identity between the two periods in dispute. True, combination by the March agreement

or by anything done since then is denied by the answers, and testimony was introduced in support of the denial. We need not recapitulate either the terms of the agreement or the facts and conditions already stated. We cannot believe that the changes in ownership of stocks, in managerial officers and the like, have operated to relieve the railroads and coal interests in question from the influence in practical effect and consequence of a unified control. It cannot be that, in the absence of intent or design, substantially the same things of controlling importance could have been worked out during the later period that were before. It is not necessary that the proofs should show that precisely similar methods were adopted to bring about the continuance averred, or that all the parties theretofore engaged, like the withdrawing trunk lines, continued as actors. The results attained and continued through a unity of purpose and concert of action by those remaining in the combination at and after the date of the March agreement are the true tests of the trend of the evidence as an entirety.

Upon the whole we conclude that the March agreement, and what has been and is being done under it, operate unreasonably to restrain and monopolize commerce among the states, and consequently that complainant is entitled to relief; but the precise extent and nature of relief to be awarded cannot at this stage be determined. The case has been tried on the issue of continuance or not of the antecedent combination and restraint; and this has resulted in leaving the court unadvised of the claims of counsel for either side as to the nature and extent of relief, if any, that should be granted. However, we now hold (1) that the equity of the Lake Shore and of the Chesapeake & Ohio in the capital stock of the Sunday Creek Company shall be disposed of by absolute sale, and to this end the trustees in whose names such stock is held shall be made parties defendant to this suit (Bates Fed. Eq. Proc., § 639; Perrin, Adm'r, v. Lepper [C. C.] 26 Fed. 545, 548; St. Louis, etc., Ry. Co. v. Wilson, 114 U. S. 60, 62, 5 Sup. Ct. 738, 29 L. Ed. 66; Woodward v. McConnaughey, 106 Fed. 758, 45 C. C. A. 602 [C. C. A. 9th Cir.]); (2) that the joint ownership and control of the Kanawha & Michigan must be terminated. The questions not decided and upon which leave will be given for further argument are (a) whether the holders of capital stock in the Hocking Valley, other than the Chesepeake & Ohio, are indispensable parties to the cause; (b) in what manner the termination of the joint ownership and control of the Kanawha & Michigan shall be effected; (c) whether in connection with the means adopted for the termination of such joint ownership and control of the Kanawha & Michigan the reciprocal trackage arrangement over the Hocking Valley and the Toledo & Ohio Central must be terminated; and (d) to what further extent and in what further respects, if any, relief shall be granted touching the control and operation of the other railroads mentioned.

Such further argument will be had at a date hereafter to be fixed between January 21st and 31st next.

KNAPPEN, Circuit Judge, concurs.

DENISON, Circuit Judge (concurring in part, dissenting in part). I quite agree that the present ownership of the Sunday Creek stock by or for the railroads is unlawful, and that the coal companies and the railroads should be separated. This conclusion must be tentative, until the other necessary parties can be heard, but it seems probable that all the facts have been developed. I would base this result on the commodities clause of the Hepburn Act and the "mere instrumentality" theory of the Lehigh Case, 220 U. S. 257, 31 Sup. Ct. 387, 55 L. Ed. 458, rather than upon the Sherman Act; but the use of either basis brings the same result. Beyond the matter of the coal companies, and in the mere present relation of the railroads to each other, I am unable to see any monopoly or restraint of commerce forbidden by the anti-trust law. Some of the considerations compelling me to this opinion are these:

1. It is true that the history of their former relations during the 1900–1910 period must be studied for whatever bearing it may have on their present intent; but this study discloses to me, not continuance but change, not identity but antithesis. The Hocking and the Central [6] were parallel roads with common termini and with other common points. They had competed bitterly for the Hocking coal district traffic to Columbus and to Toledo, as well as for all other traffic originating on their lines and destined to common points. In 1900, the Hocking bought the Central, and from then until March, 1910, this naturally and theretofore actually competing line was owned by the Hocking. The Hocking dictated the policy of both. Both had the same directors and managing officers. The merger was complete. Competition was not restrained; it was eliminated. No more perfect union and joinder in operation, while saving the former corporate identity of each, could be stated. After March, 1910, these two roads continued physically as before; but neither the Hocking nor its dominating stockholder had any ownership of the Central or had any interest, direct or indirect, in such ownership; nor did the Central or its dominating stockholder have any ownership of or direct or indirect interest in the Hocking. No director or officer of one road was director or officer in the other, or had any share in its management or operation. No more complete severance of the two roads could be formulated. There remained no connecting link (except the common control of the Kanawha, hereafter discussed).

2. Since March, 1910, there has been full and complete competition between these two roads (save only for the Kanawha traffic). As to all the Hocking coal district traffic bound for Columbus or Toledo, and as to all other business originating on these roads, competition is unimpaired. So reads all the evidence; there is no proof to the contrary. The competitive conditions prevailing before the unlawful merger of 1900 have been restored—excepting only that the rate-cut-

[6] I will refer to the Hocking Valley Railway Company as "the Hocking"; to the Toledo & Ohio Central and the Zanesville & Western Railroads as "the Central"; to the Kanawha & Michigan Railway Company as "the Kanawha"; to the Lake Shore & Michigan Southern Railway Company as "the Lake Shore"; and to the Chesapeake & Ohio Railway Company as "the Chesapeake & Ohio" or "the C. & O."

ting war then in progress has not been resumed. Both roads maintain their rates against sudden or secret cuts, as they are bound to do by both state and federal law. To base the assumption that they are combining in restraint of trade solely upon their maintenance of the same rates between common points would, by the same token, convict every railroad in the United States which is obeying the law; yet such assumption is, to my mind, the only basis for believing that such combination has existed since March, 1910 (still excluding from our thought and reasoning the Kanawha traffic).

3. The conclusion just stated—that there is no other basis for inferring a suppression of competition—is not affected by observing the joint trackage contract. It is true this contract was made during the period of undue intimacy, and probably it would not have been made between roads actively competing as strangers to each other; but this does not determine its character or effect. In March, 1910, the two purchasers (the Chesapeake & Ohio and the Lake Shore) of these roads found this joint trackage contract in existence. They saw that the entire physical and traffic situations on both roads were accommodated to this contract. They saw that it served, in large measure, as a substitute for double tracking each road; that it enabled each road to haul more traffic and give better service and at a less cost, and so, presumably, at a less rate, than either could otherwise have done, except by expending vast amounts in double tracking; that it was an operating arrangement having no connection whatever with competitive traffic seeking; that of itself it was of great and undisputed benefit to both railroads and to the shipping public, and of itself did not and could not work any harm to any interest, public or private. Under these circumstances, the purchasers preserved and continued this public and private benefit, and I cannot see how such conduct has any bearing, even evidential, to convict them of suppressing competition in traffic getting.

4. The conclusion that since March, 1910, competition in traffic originating on these lines has not been restrained, is confirmed by the fact that there is no complaint by shippers of such traffic. Serious or long continued restraint of proper competition is a disease producing inevitable and well-known symptoms—discrimination, excessive rates, poor service, unfair practices, and the like. The relations now said to be unlawful had been in existence for a year when this bill was filed, and for another year before the testimony was closed; and we did not have pointed out to us in the argument, nor have I seen in the record, any instance of any complaint by any shipper or consignee on any of these subjects.[7]

---

[7] I do not overlook the broad complaint that the rates from the Hocking district were too large in proportion to the rates from the Kanawha district; but, in fact, all rates were fixed with relation to the Pittsburgh-Ashtabula rate. This rate was not made by these defendants, but it was the "keystone of the arch." When the Commission reduced this Pittsburgh rate from 88 to 78 cents, the Hocking voluntarily reduced its Hocking-Toledo rate from 85 to 75 cents, and the 75-cent rate has been sustained by the Commission. See Interst. Com. Com'n R., opinion No. 1941, case No. 4274, New Pittsburgh Coal Co. v. Hocking Valley Ry. Co., vol. 24, p. 244.

5. If I am so far correct, there remains for consideration among the primary inquiries only the matter of joint control of the Kanawha by the other two roads; and the conclusion which we reach as to whether or not this joint ownership and control, as developed in this case, are violative of the law, must, I think, determine the whole case. I agree that the fact of the ownership of this stock by the Chesapeake & Ohio and the Lake Shore, instead of by the Hocking and the Central, is not of itself controlling. The presence of the former roads, instead of the latter, in the field of the problem, can affect only the question of the dominant intent in the whole transaction. The name in which they entered their Kanawha stock purchases means nothing. I agree, also, that the entire arrangement of March, 1910, was accompanied by, and in some degree depended upon, a clear understanding (and, therefore, an agreement) that the Kanawha should, as far as it could, divide its through north-bound traffic equally between the Hocking and the Central. This does not become less true because they never executed the contemplated written agreement, nor because their perfected understanding referred to a division that should be "fair" rather than to one that should be "equal." Under the anticipated conduct of all parties—equal furnishing of cars, etc.—no division which was not equal would be fair, and the two mean the same thing.

6. We are brought, then, to the general question when and how far the purchase, by two parallel and competing roads, of a common connecting and continuing road, under an agreement to divide the through traffic derived therefrom, violates the law, and then to the specific question of application to the facts of this case.

Purchase by one line of a connecting and continuing line has never been thought unlawful, although, if the purchasing line is one of two or more competing for the through traffic from the connecting line, such purchase, inevitably, strongly tends to destroy existing competition.[8] Such a joint purchase by two competing lines has never been held ipso facto unlawful. Indeed, the Supreme Court has said (by what is probably a dictum, Southern Pac. Co. v. Interstate Com. Com., 200 U. S. 559, 26 Sup. Ct. 330, 50 L. Ed. 585) that such competition is not the competition which an analogous statute was intended to preserve. In March, 1910, the first carrier had the right to select the continuing carrier. After June, 1910, this right belonged to the shipper, if he chose to exercise it; and it calls for a construction of the statute which has not yet been given to say that an agreement between carriers as to how they will divide and carry this kind of traffic (a very differ-

[8] At one time, the New York Central, the Erie and the Lehigh competed at Buffalo for the east-bound through traffic from the Lake Shore, and the Michigan Central, Grand Trunk, and Lake Shore competed for the west-bound through traffic from the New York Central. The purchase of the Lake Shore by the New York Central restricted, if it did not end, this competition, for not until June, 1910, could joint rates have been compelled, nor, if there had been through joint rates, did the shipper, until that time, have the right of selection. See 36 Stat. at Large, 552, 553. Formerly, a through joint route could be compelled only as there was no existing "practicable" through route. And see note 14 as to joint through routes after June, 1910.

ent thing from a pooling contract) or the carrying on of such division when this bill was filed is a monopolizing or restraint of trade or commerce contemplated by the act.[9]  At the same time it is clear that competition between carriers for traffic from one connecting line may affect the condition of the shipper upon the originating line, and I see no reason to doubt the proposition which, in this respect, must underlie the opinion of the court, viz., that the forbidden restraint *may be* found in this joint purchase of a common extension by two competing roads; but it seems clear that in a case of this class the criterion must consist in the principle stated by Mr. Justice Lurton in the St. Louis Terminal Case, 224 U. S. 394, 32 Sup. Ct. 510, 56 L. Ed. 810:

"Whether it (the transaction in question) is a facility in aid of interstate commerce or an unreasonable restraint forbidden by the act of Congress * * * will depend upon the intent to be inferred from the extent of the control thereby secured over the instrumentalities which such commerce is under compulsion to use, the method by which such control has been brought about and the manner in which that control has been exerted."

From this statement and from the very recent, familiar decisions of the Supreme Court, including the Union Pacific Merger Case, supra, and the Reading Case, 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. ——, it seems accurate to say that whether the situation created in March, 1910, operated in aid of interstate commerce or in the forbidden, unreasonable restraint thereof will depend upon (1) the extent of commerce restraining power inherent in the joint ownership of the Kanawha; (2) the characterizing intent and purpose of this joint ownership to be inferred not only from the power secured, but from all the proofs; in other words, whether such restraint of competition as was inherent in the joint ownership would amount to a primary, and therefore direct, restraint of trade, or would rather be incidental to ends primarily lawful; and (3) the amount of restraint, actual or potential, which did take place.

7. If this joint ownership has the prohibited effect, it must be found (a) in competition as to divisions; (b) in competition as to rates; or (c) in competition as to service.

(a) Clearly this joint ownership tends to prevent the Central and the Hocking from bidding up against each other in the divisions that they will offer to the Kanawha for this traffic, and so the other Kanawha stockholders might make less money. This is not the kind of competition which the statute desires to preserve. It serves no public interest. It tends, because of a disproportionate division to the initiating carrier, to poor service by the continuing carrier and to indifference by both to the interests of the shipper. It has long been recognized as a traffic evil. On its elimination we cannot predicate guilt.

(b) It is clear, too, that an agreement to divide traffic would, as a

---

[9] Without doubt, two parallel roads might join in building, from a common terminus, and owning a new road connecting with and continuing both. Joining in buying an existing extension seems to stand, logically, on the same ground, unless, as matter of fact, the purchase was with the dominant purpose of stopping existing or normal competition.

general proposition, have some tendency to prevent competition in rates; that is, the Hocking would not be so likely to name its lowest rate from the Ohio to the lake as if it was not sure of half the traffic any way, and so the through rate from the Kanawha district to the lake might not fall to the point where it would be brought by full competition.[10] This is, I think, as strongly as this feature can be stated. It is, of course, now perfectly well settled that free competition is the policy of the law, and it is none of our concern whether this is, as to railroads, the best economic policy; but, when we are trying to decide whether we are compelled to find a dominating intent to restrict trade merely because one inducement to compete in rates is removed, we cannot shut our eyes to the small part which rate competition now plays. These contracting parties knew, in 1910, as we all now know perfectly well, that under the thorough and efficient administration of the Interstate Commerce Law rate cutting, as a means of getting business, either from shippers or from connecting lines, has ceased. All rates, through as well as local, must be published, and cannot be cut until after 30 days' notice. A published cut is reasonably sure to be met by all who are competing without a differential. No contract for traffic in consideration of a cut can be made, and, as cutting rates will not get business away from a competitor, rates are not voluntarily cut. I do not mean to say that this disappearance of rate cutting makes lawful a contract to maintain rates—not at all; but it does affect and minimize the evidential importance of a contract removing one inducement to cut rates, when we are determining the character of the entire transaction of which that removal is only one element.[11]

(c) Coming to competition in service, it is not to be denied that such a traffic-dividing agreement as here exists tends to discourage this kind of competition, and that there is here, in theory, some degree of restraint, more likely to have actual effect than is the restraint as to rates.[12]

We find, then, both as to rates and service, some impediment to ideally free competition; but that ideal is rare, if it exists at all. We must have a practical standard of comparison. That standard must be

[10] The actual effect of the (theoretical) rate sustaining interrelationship is minimized by the fact that coal rates go by districts, and a change in one district would affect all the others. (See note 2.)

[11] In the same way, when some tendency to maintain high rates is only an incident of the contract under attack, we may well remember that the shippers' meritorious grievance on this point is the maintenance of an unreasonable rate, and for that he has an effective remedy.

[12] While each road is content with half the Kanawha traffic, and the Kanawha has the power to equalize, the agreement to divide tends to make both Ohio roads careless as to good service. Now that the shipper has the absolute right of through routing, the Kanawha's power to equalize rests solely on its relations to the Sunday Creek mines, which originate a considerable part of the tonnage, available as an equalizing medium, so that here, too, the Sunday Creek ownership is the real evil. With this removed, the agreement to divide the Kanawha traffic becomes comparatively ineffective, and the shippers' right of through routing must bring the freight solicitors to them in competition.

the lawful situation which would exist, except for the agreement said to be forbidden. This lawful situation is usually that which was displaced by the agreement under attack; but in this case the next earlier situation was itself unlawful, and to get on solid ground we must go back to 1899. The theoretically perfect remedy would be to restore the condition existing in 1899. The bill of complaint and the logic of the situation lead there and lead us nowhere else. When we get there, we find that the Central practically owned the Kanawha. For 10 years it had been the majority stockholder, and it was in absolute control. For the Kanawha traffic, the Kanawha and the Central formed one through unitary line from the mines to the lake. The Hocking could not compete for part of the haul, and, so far as concerns any benefit to the Kanawha shippers, the Hocking might as well have been out of existence.[13] As compared with this situation, I cannot doubt that the present arrrangement is an aid, not a restraint, to competition.

This was in 1899. If we ought to look for a standard of comparison in 1910, that standard must be such other lawful arrangement as might naturally have resulted in the course of separating the two Ohio roads, if the contract for joint control of the Kanawha had not been made. This other arrangement would almost certainly have been the purchase of the Kanawha by or for either the Hocking or the Central exclusively in its own interest. The Kanawha had always been operated in connection with one or the other or both of these roads. It had little reason for existence, except as an extension of one or both of these roads. Except in co-operation with them, it could not get its coal to market. It is not impossible that a wholly independent purchaser for the Kanawha might have been found, but that there should be an independent purchaser who did not plan to resell to one of the other through lines, and who would pay anything like the price which the road was worth to either one of the Ohio lines as an extension, is highly improbable. Suppose, then, that it had been purchased in 1910, by or for the Central (and the government concedes this would have been lawful), it follows that all the Kanawha traffic would have gone through Ohio over the Central so far as the Kanawha and the Central, acting directly or indirectly, could have brought about this result. So long as a satisfactory through route was provided by the Kanawha-Central line, the Kanawha could not have been compelled to establish a through route or rate by way of the Hocking, and the Hocking could not have competed at all.[14] Even if the Kanawha could have been compelled to establish

[13] There was then (in 1899) no way of compelling the Kanawha to join the Hocking in a through route or joint rate; nor was there, indeed, in 1910. (See note 14.)

[14] In March, 1910, the Commission could direct two roads to join in a through rate and route only, "provided no reasonable or satisfactory through route exists." 34 S. L. 590. It seems clear that the Kanawha-Central route would have been made and kept a "reasonable and satisfactory through route" so that the power to compel the Kanawha to join with the Hocking never would have arisen. In June, 1910, this proviso was cut out, but its place was taken by the provision (36 S. L., 552): "And in establishing such through

a through route and rate via the Hocking the same as via the Central, the Kanawha-Central could have made the part of the rate south of the Ohio river so high, and the part north of the river so low, that the Hocking could not make a competing local rate; or, even if this trouble was overcome, there would still remain the numerous practical obstacles which the Kanawha-Central management could oppose to a diversion of part of its through traffic. In any of these events, the Kanawha shippers would have no remedy from the law or from the Interstate Commerce Commission, excepting to compel a reasonable through rate; and that remedy has never been impaired.

These considerations lead me directly to the conclusion that the Kanawha-Hocking-Central relationship now attacked produced (inherently) for the Kanawha district shippers less monopoly and more competition and better service than would have followed from either of the alternative arrangements which would naturally have resulted in 1910, if this one had not been made. The other would have been concededly lawful. I cannot find unlawful monopoly, resulting from inherent power to restrain competition, where that power is less than it would be in the lawful alternative situations.

8. If the intent unlawfully to monopolize or restrain may not be inferred merely from the existence of the power, where that power is of the limited extent and of the peculiar nature which have been described, is that intent otherwise proved by this record?

The five trunk lines had been engaged in an unlawful combination and had been directed by the Ohio Supreme Court to dissolve such combination. It is their purported dissolution which is now under review. Where the only question is whether the defendants are in bad faith continuing a violation of the law after having pretended to quit, it seems to me reasoning in a circle to draw, from their former misconduct, any serious inference of their present bad faith.

If the Chesapeake & Ohio and the Lake Shore had purchased the Kanawha stock with no interest in the subject-matter, except to control its traffic for the Hocking and the Central, the question would be different; but that was not the sole interest of either purchaser. The Chesapeake & Ohio desired an outlet to Lake Erie for all of its own great

route, the commission shall not require any company, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith which lies between the termini of such proposed through route, unless to do so would make such through route unreasonably long as compared with another practicable through route which could otherwise be established." This is awkwardly expressed, because of the lack of definite antecedent for "to do so"; but it seems to mean that if the condition in 1899 was restored, and if the Hocking demanded from the Kanawha a joint through route, via either Athens or the river division, the Kanawha could not be required to comply, because such route would embrace substantially less than the entire length of the Kanawha to Corning, and less than the entire route between its termini, the Kanawha district and Toledo, over railroads "operated in conjunction and under a common management and control." So the Hocking solicitors, in the Kanawha district, would have been helpless.

traffic.[15] For this purpose, it desired to buy the Hocking. This purpose and this desire were beyond criticism; but to reach Gallipolis, the nearest point on the Hocking, it must build across the Ohio river and over 30 miles of difficult country, and it must then, for its traffic, either practically rebuild the Hocking river division, 75 miles, to Logan, or build, new, 50 miles, to Athens, in order, one way or the other, to reach the modernized lines of the Hocking. Why should it be required to do this, paralleling the Kanawha, when it could buy such an interest in the Kanawha as secured to it the indefeasible right to use the Kanawha as this connecting link? What rule of public policy required it to build this new road instead of buying the existing road?

Turning to the Lake Shore, we find that it desired to buy the Central for the purpose of reaching the coal fields and getting both coal traffic and fuel coal for itself and its allied New York Central lines, and to make connections for through traffic both ways, with the Coal & Coke and the Western Maryland roads. These were rightful and legitimate objects, also beyond criticism. So was its desire to have this feeder reach the Kanawha district. Apparently, no one questions that it could rightfully have purchased the Kanawaha outright, nor is there, to my mind, any reason for ascribing to the Lake Shore any moving purpose in the whole transaction of March, except that just mentioned.

We find, then, that the Chesapeake & Ohio had the legal right to buy the Kanawha and a strong and lawful motive for so doing, and that the Lake Shore had the same right and an equally strong and lawful motive, and that this underlying and justifying motive by each had nothing to do with the thought of suppressing competition between the Hocking and the Central; yet the Lake Shore knew that, if the Chesapeake & Ohio made the purchase, the Lake Shore would be defeated in its plan of reaching the Kanawha fields, and the Lake Shore's subsidiary, the Central, would get no Kanawha traffic which the Kanawha could divert; and the Chesapeake & Ohio knew that, if the Lake Shore made the purchase, not only would the former's subsidiary, the Hocking, get little through traffic, but the whole scheme for the Chesapeake & Ohio outlet to the lake would be defeated. Under these circumstances, what more natural than that they should join in buying the Kanawha, each secure against exclusion by the other, and what primary or characterizing unlawful purpose can be found in such a joint purchase? If this joint purchase was, for these reasons, rightful and lawful, as I believe it was, the arrangement for dividing between

[15] That this was real, not pretended, is shown by what happened. In 1909, the first full year before the change, the C. & O. delivered to the Kanawha for hauling over its line, 4,000 tons of coal and coke and 70,000 tons of other freight. In 1911, the first full year after the change, it so delivered 811,000 tons of coal and coke, and 168,000 tons of other freight. Between the same periods, southeasterly bound freight received by the C. & O. from the Kanawha increased from 122,000 tons to 199,000 tons. This enormous tonnage given by the C. & O. to the Kanawha was not merely diverted from the other connections of the C. & O., because there was no decrease in the tonnage given to these other connections.

the Central and the Hocking the traffic originating on the Kanawha, though important in itself, becomes relatively a mere incident of the main transaction, and its real purpose was to prevent a monopoly of this traffic by either purchaser. It makes little difference how express the equal division agreement was. Such an agreement would be implied from such a situation. Nothing else would be fair or right. If a receiver should be appointed for the Kanawha, the court would direct him to do just what this division agreement called for and what these parties have been doing, viz., divide this traffic equally between the two Ohio lines, so far as he could do so and so far as they were equal in their furnishing of cars and other facilities; in other words, "to treat them fairly."

9. The remaining element of the assumed general criterion is the amount of restraint, actual or potential, which did take place.[16]  Here, again, we find that the natural symptoms of a suppression of competition did not exist. No one complains of any suppression or of any practices resulting therefrom; and this for the very good reason that there never was any competition to suppress. It is difficult to prove that defendants have put a burden upon a thing which never existed. Not only is the record barren of any suggestion that the Kanawha shippers ever had the benefit of any competition between the Central and the Hocking, but it affirmatively shows that during the 10 years before 1910 competition was impossible, because the Hocking controlled everything; and that before 1900 it was impossible, because the Kanawha belonged to the Central.

It is certain, then, that the result which will condemn the agreement must be found in the suppression of "potential" competition, and we must ascertain what this means. In the Union Pacific Case the thought was applied with reference to undeveloped traffic from territories already reached by the two roads, and which traffic might grow into larger volume; but the same idea must extend to new and likely methods of competition and even, in some instances, to the building of new roads or branches to make competitive territory out of that which has been tributary to one road only. Whether competition, between the roads now existing, in cutting rates, etc., is probable enough or would be serious enough under the facts of this case to be that potential competition which must be preserved, has been discussed. It is still possible that the Ohio road which saw the Kanawha sold away from it would have built a new line to the Kanawha district even in spite of the great topographical difficulties. Such new road apparently could not have reached any mines now on the Kanawha, because there is room for no new track along the river next to these mines; but, treating the district and not the individual mines as the shipping unit, it could have reached other parts and developed new mines. That

[16] The Kanawha traffic to be divided was about twenty-five per cent. of the total traffic of the two Ohio roads. This appears only as to the Hocking; I assume a similar ratio on the Central. I reach this result by taking the figures for 1911 (Ex. 138) and excluding the south-bound tonnage from the total of Kanawha and excluding the C. & O. tonnage from total Kanawha and total Hocking.

it would have done so is, however, the merest surmise. It is not even probable, so far as the record informs us; and I cannot condemn the joint Kanawha purchase because it has possibly prevented the building of another line in some unknown location at some vague future time. An arrangement which removes the motive for building a competing line cannot, for that reason alone, amount to an unlawful forestalling of potential competition, unless such forestalling was a substantial and moving purpose of the arrangement, and unless the building of such other line was at least reasonably probable—indeed, the latter condition covers both, because it could not be the main and sufficient motive, unless the new road was foreseen as probable.

Finally, in testing the actual results, we must look to the Kanawha shippers. All this controversy is to protect their interests—and, of course, the correlative interests of the public which buys from them. Have the shippers been injured? Are their rights in jeopardy? On one hand, it appears that there is somewhat less of motive on the part of the Central and the Hocking to compete on a part of the through haul than there would be under certain other circumstances which never did exist, which would not have been a probable alternative, but which perhaps might have come into existence. I find nothing else to put on this side of the scale. On the other hand, it appears that the great trouble in coal shipments is to get cars, and that the Kanawha, even when in combination with the Central and the Hocking, was poorly supplied with cars and served its shippers poorly. It was greatly interested in its own coal companies, and it would have supplied them if it could, even if it did not impartially distribute all the cars it could get. Under these conditions, coal shipments from the mines along the Kanawha amounted, in the last six months of 1909, to 36,000 cars. With the transfers in March, 1910, there came a new outlet to all the western C. & O. territory, and direct and close relations which made it to the interests of these two trunk lines to furnish cars to the Kanawha.[17] It seemingly must have been due, at least in a large part, to these greater facilities that the shipments by the mines along the Kanawha had increased in the last six months of 1911, to 42,000 cars. This does not seem to indicate a substantial restraint of trade and commerce. It seems to me clear that the Kanawha shippers and their dependent public have been benefited by the transaction of March, 1910, taken as a whole, and that interstate trade and commerce have been promoted thereby;[18] while the only restraint affecting such shippers or such commerce is theoretical rather than actual, and such as

[17] Up to July, 1909, the Hocking, Central, and Kanawha cars were pooled and used interchangeably on these roads. During the nine months intermediate the end of this pooling arrangement and May 1, 1910, the date of full effect of the March contracts, the Central furnished to the Kanawha an average of 266 cars per month. During the same months of 1910 and 1911 it so furnished an average of 1,466 per month.

[18] In 1909 the New York Central lines were furnishing 1,600 cars per month to the Central; in 1911, 8,300 cars per month. Coal production at the mines on the Central increased 500,000 tons for 1911 over 1909.

it is, arises out of a natural, if not necessary, incident of the main transaction.

10. There remain for consideration two further suggestions. It is said that the Hocking and the Kanawha are competing roads, and hence that the former cannot take part in managing the latter, either directly or through the instrumentality of the Hocking's chief stockholder. I am not satisfied that these two roads are in any fair sense competing. That portion of the Kanawha extending from Hobson north 40 miles to Corning, and that portion of the Hocking extending from Logan south 50 miles to the river, are substantially parallel and 20 miles apart. There is some traffic to and from two or three small towns, Pomeroy, Middleport, and Gallipolis, but the Kanawha does not reach these towns with its own track, and runs to them over the Hocking under a trackage contract which does not permit it to compete with the Hocking, except by the latter's sufferance. A small amount of coal is produced at some mines along the southern part of the Hocking river division. The Kanawha might, by building its own spurs and branches, reach these three towns and these mines, but the whole of the traffic so reachable and as to which, theoretically, there might be competition, is negligible both in percentages and in total volume; neither is any reason shown to anticipate increase.

The relative positions of the Hocking and the Kanawha are not those of parallel and competing roads, but those of connecting and continuing roads having an end overlap. It is, in principle, though not in degree, as if the New York Central ran from the east to Niagara Falls through Buffalo, and the Michigan Central, from the west, to Buffalo, through Niagara Falls. Here would be from Buffalo to Niagara Falls two parallel roads, and they might compete for the freight originating at those and intermediate points. This could hardly be thought sufficient to deprive these two roads of their substantially connecting, rather than competing, character. So here, one looking at the map must, I think, observe that the Hocking and the Kanawha form substantially a connecting and continuing line from Gauley Bridge to Lake Erie, and do not lose this character because a branch or spur of the Hocking Toledo-Athens main line branches off at Logan, parallels the north end of the Kanawha and strikes it at Kenauga.

It is true the Ohio court made a finding that these roads were parallel and competing, but the court was considering that portion of the Kanawha north of the river, and not, as we must do, the entire road; and also was treating the Kanawha as part of one system with the Central, a thing which we now cannot do. That court was also considering intrastate commerce, as to which the conclusion of fact might well be different from the proper conclusion regarding the immense volume of traffic involved under this record.

11. It is also said that the C. & O. and Kanawha are competing roads, and hence the former cannot take part in the management of the latter. The roads are parallel from Gauley Bridge to Charleston, a distance of 30 miles along opposite sides of the Kanawha river. The mines on one side ship over the Kanawha; on the other side, over the C. & O. On neither side can they practically reach the other rail-

road. The cost of crossing the river would be prohibitive. On neither side could another railroad track be built, the river valley being, at many places, a mere gorge. From Charleston to the Ohio river the courses are generally divergent, one tending north, the other west. Charleston is a common point, and there should be, at this point, competition for freight originating at Charleston or coming in over the Coal & Coke Railroad and destined for the Northwest. The interest of the C. & O. in the Kanawha would theoretically tend to restrict this competition, though the tendency would be imperfect, because over its own lines the C. & O. would get the entire haul to Chicago, while the other way it would be interested in half the profit on the haul from Charleston to Armitage, and half of the volume of the traffic from Armitage to Toledo. One common point, with the amount of traffic existing at Charleston, would, in any event, be hardly sufficient to give a competing character to these railroads, but, even if the theoretical but imperfect tendency to limit this competition could ever sufficiently invalidate an interest by one in the other, yet, in this case, such tendency must yield to the undisputed testimony, which is that the competition at Charleston between the soliciting agents has continued active and vigorous since March, 1910, as before.

The map also suggests that control of the Kanawha might be used to block the making of a through line from the seaboard to the lakes, by way of the Virginian, the Kanawha and the Central, which through line would, as a whole, compete with the C. & O. It is sufficient to say of this suggestion that no such issue is suggested by any pleading, and that the Lake Shore, in purchasing its interest in the Kanawha, guarded against interference by the C. & O. with such possible future plan.[19]

Upon the whole case I see two great shipping districts with interests involved—the Hocking coal district and the Kanawha coal district. The Hocking shippers *were* subject to a monopolistic combination of all transportation facilities. They *now* have these facilities divided between two-trunk lines, wholly independent of each other, as to competition between which there exists no obstacle which a court can remove. The Kanawha shippers *were always* subject to that monopoly which results from having only one railroad outlet. This has been neither increased nor diminished; but by the alliance between their railroad outlet and two strong lines the shippers can reach much new territory, and the outlet has its facilities and usefulness much increased. As to the one feature (joint Kanawha control), in which the position of the shippers might be better, we are asked, it seems to me, to *create* competition.

---

[19] Indeed, the entire subject-matter of this numbered paragraph should be disregarded for the same reason. Paragraph 20 of the bill limits the issue to the charge of a continued combination between the Hocking, the Central, the Zanesville and the Kanawha. It is important to know what the C. & O., as owner of the Kanawha, is doing with the Kanawha; but, to the issue tendered and made, it is immaterial whether the C. & O. is under disability to become the owner of the Kanawha.